# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

---

No. 96-2235EM

---

United States of America,    *
                            *
       Plaintiff/Appellee,    *    Appeal from the United States
                            *    District Court for the
       v.                   *    Eastern District of Missouri.
                            *
Jose Erik Guerra,          *
                            *
       Defendant/Appellant.    *

---

Submitted: February 11, 1997

Filed: May 9, 1997

---

Before RICHARD S. ARNOLD, Chief Judge, HANSEN, Circuit Judge, and BATTEY,[*] Chief District Judge.

---

BATTEY, Chief District Judge.

      Following a jury trial, Jose Erik Guerra ("appellant" or "Guerra") was convicted of conspiracy to distribute methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and 846. Guerra appeals his conviction from the district court[1] on the following issues: (1) the district court erred in admitting a coconspirator's out-of-court statements pursuant to Fed. R. Evid.

---

[*]The Honorable Richard H. Battey, Chief United States District Judge for the District of South Dakota, sitting by designation.

[1]The Honorable Stephen N. Limbaugh, United States District Judge for the Eastern District of Missouri.

801(d)(2)(E); (2)the prosecutor's statement in closing amounted to vouching for the credibility of a witness; (3) the prosecutor's questions regarding appellant's status as an illegal alien constituted prosecutorial misconduct; (4) the district court committed plain error; (5) the prosecutor erred in eliciting testimony as to appellant's post-Miranda silence; (6) the district court erred in determining the quantity of drugs which it attributed to appellant; and (7) the district court erred in adding a four-level enhancement for a leadership role.[2]  We affirm appellant's conviction and sentence.

## I.  Background

This case involves an extensive multi-party conspiracy involving the distribution of methamphetamine in Missouri. In a week-long trial, the government established a conspiracy between several individuals including appellant Guerra.  Three of Guerra's coconspirators, Darrell Jones ("Jones"), Brandy Cordova ("Cordova"), and Dianne Whyde ("Whyde"), testified at trial. Coconspirator Antonio Espinosa-Montero ("Montero") absconded prior to trial. The evidence demonstrated that Cordova, Jones, and Montero were the distributors, and Guerra was the California manufacturer and Montero's supplier.

In 1994, Jones, a truck driver and part-time drug dealer, became fully involved in distributing methamphetamine. (Tr. 2-204).  He purchased quantities of methamphetamine from Cordova, who was Jones' California connection. (Tr. 2-204, 2-206).  Jones would obtain the drugs in California and return to Missouri where the

---

[2]Upon review of the record, we considered all issues raised by appellant.  We find that the remaining issues raised by appellant do not merit discussion and would not warrant a reversal as to appellant's conviction or sentence.

drugs were distributed. Jones did not know that Guerra was Cordova's source. (Tr. 2-219).

On January 20, 1995, Jones arranged to purchase some methamphetamine from Cordova. The exchange took place in a room at the Residence Inn in Ontario, California. (Tr. 2-215, 217) On that day, Jones noticed a black car in the parking lot. (Tr. 2-218). Jones later identified the individual whom he saw in the car as Montero. (Tr. 2-220, 2-221).

Cordova lived in a remote desert ranch with his girlfriend, Whyde. Whyde assisted Cordova by taking messages from his distributors and relaying these messages to Cordova. Beginning in October of 1994, Cordova's source for his methamphetamine was Montero. Whyde testified that Montero had come to their ranch and that he and Cordova would go to the garage to "do their business." (Tr. 3-18). Cordova told Jones that he had a new source, and Jones confirmed this fact because the quality of the drugs he was receiving improved. (Tr. 2-210). Cordova testified that Montero told him that he received the manufactured methamphetamine from "a pesado," meaning a drug lord in Spanish. (Tr. 3-68). Cordova interpreted this to mean the main man, the manufacturer. (Tr. 3-67). Montero later revealed his source as Guerra. (Tr. 3-80).

In February of 1995, Jones was arrested in possession of a large amount of cash and drug paraphernalia. (Tr. 2-27). Officers also seized a phone list which contained Cordova's number. (Tr. 2-33). Jones agreed to cooperate with law enforcement in setting up a buy-bust in California. The buy-bust took place on March 7, 1995, in Ontario, California. (Tr. 2-166).

On March 2, 1995, Jones placed a recorded call to Cordova's residence. Jones talked to Whyde and told her that he would be

making a trip out to California the following week. (Tr. 2-161). In California, on March 7, 1995, Jones again called Cordova's residence. He spoke with Whyde and told her that he was there to buy. (Tr. 2-226). Cordova called Jones back and told him it would take a couple hours for him to arrive. Jones requested two and one-half pounds of methamphetamine. Cordova agreed to bring three pounds. (Tr. 2-228).

Cordova then called Montero and told him that Jones was in town. Montero said that he needed to call his "main guy." Cordova asked Montero if he was the same supplier who had brought the last delivery when Cordova had been waiting at Montero's house. Montero told him it was. After his telephone conversation with Montero, Cordova left for Montero's residence. When he arrived he saw the same car sitting in the driveway at the house which had dropped off the methamphetamine the previous time that he was at Montero's home. After Cordova arrived, Montero completed the delivery of the methamphetamine. Cordova observed that the driver of the vehicle was Guerra. Cordova was to meet Montero and the main guy after the delivery to Jones. Cordova went to the hotel to make the delivery to Jones where Cordova was arrested. (Tr. 3-100 through 3-108).

## II. Fed. R. Evid. 801(d)(2)(E)

Guerra alleges that the court erred in admitting statements made by his alleged coconspirators. The statements were made by Montero to Cordova identifying Guerra as the source of Cordova's drugs. The court admitted the statement conditionally under Fed. R. Evid. 801(d)(2)(E). (Tr. 2-66). See United States v. Bell, 573 F.2d 1040 (8th Cir. 1978) (permitting court to conditionally accept out-of-court statement made by an alleged coconspirator). At the conclusion of the evidence, the court admitted the statements

4

permanently. (Tr. 4-192). We conclude that the trial judge did not err in admitting the statements of coconspirator Cordova. <u>United States v. Escobar</u>, 50 F.3d 1414, 1423 (8th Cir. 1995).

For statements of a coconspirator to be admissible against a defendant, the government must prove by a preponderance of the evidence that (1) a conspiracy existed; (2) the defendant and the declarant were members of the conspiracy; and (3) the declaration was made during the course of and in furtherance of the conspiracy. <u>Bell</u>, 573 F.2d at 1043. <u>See also</u> Fed. R. Evid. 801(d)(2)(E). In <u>Bourjaily v. United States</u>, 483 U.S. 171, 107 S. Ct. 2775, 2781, 97 L. Ed. 2d 144 (1987), the Court held that "a court, in making a preliminary factual determination under Rule 801(d)(2)(E), may examine the hearsay statements sought to be admitted."

Cordova is the only coconspirator who testified regarding knowledge of Guerra's involvement within the conspiracy. Guerra objected to the following statements:

> Q.  Mr. Price: Did Montero ever tell you who he got that methamphetamine— excuse me— the manufactured methamphetamine from?
> A.  Mr Cordova:  He said that there was this one guy that, you know, he was a pretty heavy guy, okay.  He—
> Q.  Okay.  What do you mean by heavy?  You mean large and big or what?
> A.  No, sir.  He was like the main guy that, you know, he's a manufacturer. And he said that he had access to as many pounds as I wanted, or Jonsie wanted to purchase maybe 30, 40 pounds, they had it for him.  There was no problem at all.
>
> . . .
>
> Q.  Now, if I understand your testimony, you mentioned the word "heavy."  Did Montero speak English?
> A.  Very broken, but he could not understand it at all.

```
Q.   What word did he use in Spanish to describe "heavy"?
A.   Pesado.
Q.   Pesado?
A.   Yes.
Q.   And what does that mean in Spanish to you?
A.   It's slang for drug lords.
```

(Tr. 3-67, 3-68).

Later on, Guerra was identified.

```
Q.   Was there ever a time that Mr. Montero told you who his
     particular main man was?
A.   Yes, sir, he did.  At one time, he did mention Guerra's
     name over here.
Q.   And how did Mr. Montero pronounce that name?
A.   Guerra.
```

(Tr. 3-80).

Guerra makes three objections regarding the statements set forth above: (1) that the statements referring to Guerra as "a heavy," "a main man," and "a pesado" were not made in furtherance of a conspiracy because the statements were "promotional puffery"; (2) that at the time of these statements Cordova and Montero had not yet formed a conspiracy; and (3) even though the statements infer that Guerra and Montero were coconspirators, they were not coconspirators in the charged conspiracy.

## A.   Statements in Furtherance of the Conspiracy

Whether a statement is made in furtherance of a conspiracy is given broad construction. United States v. Krevsky, 741 F.2d 1090, 1094 (8th Cir. 1984). To establish that a statement was made in furtherance of a conspiracy, the government must show that the statements were more than informative and that they were made to

"advance the objectives of the conspiracy." United States v. Baker, 98 F.3d 330, 336 (8th Cir. 1996), petition for cert. filed, (U.S. March 14, 1997) (No. 96-8214)(citations omitted). Statements of a coconspirator identifying a fellow coconspirator as his source of controlled substances is in furtherance of the conspiracy and therefore admissible. United States v. Womochil, 778 F.2d 1311, 1314 (8th Cir. 1985) (quoting United States v. Anderson, 654 F.2d 1264, 1270 (8th Cir. 1981), cert denied, 454 U.S. 1127, 102 S. Ct. 978, 71 L. Ed. 2d 115 (1981)). See also Escobar, 50 F.3d at 1423 (citing United States v. Garcia, 893 F.2d 188, 190 (8th Cir. 1990)); Krevsky, 741 F.2d at 1094 (holding that statement by a coconspirator to an undercover government agent describing the duties and responsibilities of the defendants in the drug smuggling operation was made in furtherance of the conspiracy). Montero's statements to Cordova were made to identify that he had a source for his controlled substances. Montero stated that he had a "pesado," "a drug lord," who could supply Cordova and Jones with 30 to 40 pounds of methamphetamine, and he later identified this "pesado" as Guerra. These statements furthered the object of the conspiracy.

### B. Conspiracy Established

Guerra objects that at the time these statements were made by Montero to Cordova there was no evidence that Montero and Cordova had established a conspiracy. He further objects that if Montero and Cordova had established a conspiracy, Guerra did not belong to it. We have searched the record and find ample evidence that a drug conspiracy existed and that Guerra was a part of it. The district court did not err in its finding that a conspiracy existed at the time of the conversation between Montero and Cordova.

7

Cordova testified at trial that on one occasion he was waiting at Montero's house because the methamphetamine had not arrived. On this day, Montero told Cordova that the methamphetamine was on its way. Cordova heard a car pulling up Montero's gravel driveway, and Montero said, "I think he is here already." Montero opened the door to this house and said, "He's here" and told Cordova to "wait." Montero then went outside and left the door part way open behind him. Cordova observed a dark-colored car and its driver. Cordova testified that the driver of the car that day was Guerra. Cordova saw Montero walk up to the car and a package was handed to him. When Montero came back inside he told Cordova that he had checked the stuff out and that it was high quality. (Tr. 3-88).

On the day of the controlled buy, Cordova testified that the "main guy" would be accompanying Montero because of the amount of money which was involved in the transaction. On that day, Cordova called Montero and told him that Jones was in town and Montero said, "Okay, no problem. Let me call, you know, my main guy." Montero told Cordova that the "product" would be coming from the same guy as last time, "the main guy." Cordova asked Montero if he was the same supplier who had brought the last delivery when Cordova had been waiting at Montero's house, and Montero told him it was. After his telephone conversation with Montero, Cordova left for Montero's residence. When he arrived at Montero's, he saw the same car sitting in the driveway at the house which had dropped off the methamphetamine last time he was at Montero's home. After Cordova arrived, Montero got out of the car and walked over to Cordova's vehicle with the methamphetamine. Cordova observed that the driver of the vehicle was Guerra. Cordova was to meet Montero and the main guy at a designated location after the delivery to Jones. Guerra was later arrested at that location. (Tr. 3-98 to 3-108).

### III. Prosecutorial Misconduct

Guerra alleges that the prosecutor committed misconduct by eliciting testimony regarding Guerra's status as an illegal alien and by vouching for the credibility of the government's witnesses.

An improper question by government counsel may constitute prosecutorial misconduct. See United States v. Stands, 105 F.3d 1565, 1577 (8th Cir. 1997). A two-part analysis is applied: "(1) the prosecutor's remarks or conduct must in fact have been improper, and (2) such remarks or conduct must have prejudicially affected the defendant's substantial rights so as to deprive the defendant of a fair trial." Stands, 105 F.3d at 1577. See also United States v. Goodlow, 105 F.3d 1203, 1207 (8th Cir. 1997); Hale, 1 F.3d at 694. When considering the effect of alleged prosecutorial conduct on a defendant's substantial rights, we generally analyze three factors: "(1) the cumulative effect of the misconduct; (2) the strength of the evidence against the defendant; and (3) the curative actions taken by the trial court." Hale, 1 F.3d at 694 (citing United States v. Hernandez, 779 F.2d 456, 460 (8th Cir. 1985)).

### A. Question by Prosecutor as to Appellant's Status as an Illegal Alien

During the testimony of Officer Hammer, the prosecutor elicited the following information:

> Q. Mr. Price: However, did you determine at the time that Mr. Guerra was arrested as to whether or not he was a United States citizen?
>
> A. Officer Hammer: He told me that he was not a United States citizen. In fact, I wrote on his booking form that he was an illegal alien, although it was very suspect as to his actual home address.

Upon objection, the court sustained the objection and the answer was stricken from the record.  (Tr. 3-292). The district court acted properly in sustaining the objection since Guerra's alienage was not relevant. Any claimed error, however, was harmless and was, in any event, cured by the district court's action.

### B.    Vouching for Credibility of Witnesses

Guerra also alleges that the prosecutor vouched for the credibility of the government witnesses.  In closing argument, the prosecutor made the following statement:

> And I am here to tell you I think the Government would have to say that they presented excellent testimony.  They didn't—
>
> Mr. Butts: Judge, I object to him vouching for the truthfulness or credibility of the witnesses.
>
> Mr. Price: I apologize, your Honor.
>
> The Court: All right.

(Tr. 5-57).  Defense counsel interrupted the prosecutor's statement. What the prosecutor might have said had he been permitted to complete his thought is only speculative.  Whether such statement was improper might be arguable, but in the context of the argument the statement did not prevent Guerra from receiving a fair trial.  The prosecutor apologized for the statement which further reduced its effect.  The court instructed the jury in its instructions that counsel's statements were not evidence which further served to obviate any claimed error. (Tr. 5-66).

Defense counsel also objected to the following question on the basis that prosecutor was vouching for the credibility of witness Whyde:

> Q.    Mr. Price:  And if I determine that you didn't tell the truth, or someone else provides information to me that tells me, or makes me believe that you didn't tell the truth, then I have the right to deny filing that 5K motion.  Do you understand that?
>
> A.    Dianne Whyde: Yes.
>
> Mr. Butts: I think we are getting very close to Mr. Price vouching for the credibility of the witness.  I did not raise the issue that this gal was lying.  As a matter of fact, I said I am sure you are telling the truth.  I don't see where this is going, it is repetitious, and I object to it on those grounds.
>
> The Court: Well, the objection will be overruled.  But I think we have pretty thoroughly exhausted this subject, so let's proceed.

(Tr. 3-45 to 3-46).

Defense counsel was somewhat disingenuous when he argued to the trial court, "I did not raise the issue that this gal was lying" (Tr. 3-46), while at the same time conducting a thorough cross-examination concerning her plea agreement and the benefits it provided for a reduced sentence. (Tr. 3-32 to 3-42).  The challenged statement amounted to no more than prosecutorial response to defense counsel's examination and, as such, was not error.

## IV. Plain Error

11

When an issue is not raised at trial, we review only for plain error. United States v. Olano, 507 U.S. 725, 113 S. Ct. 1770, 1776, 123 L. Ed. 2d 508 (1993); Wright v. Nichols, 80 F.3d 1248, 1252 (8th Cir. 1996); United States v. Hale, 1 F.3d 691, 694 (8th Cir. 1993) (if defense counsel fails to object to prosecutor's statement at trial it will be reviewed only for plain error); United States v. Turner, 104 F.3d 217, 221 (8th Cir. 1997) (if an argument is not raised before the district court, the only standard of review is plain error). "Plain error occurs if (1) there is an error, (2) the error is obvious, and (3) the error affects a defendant's substantial rights." United States v. Hill, 91 F.3d 1064, 1072 (8th Cir. 1996) (citing United States v. Ryan, 41 F.3d 361, 367 (8th Cir. 1994) (en banc), cert. denied, ___ U.S. ___, 115 S. Ct. 1793, 131 L. Ed. 2d 721 (1995)). The burden is on the party asserting plain error. Wright, 80 F.3d at 1252; Ryan, 41 F.3d at 366. For an error to affect a substantial right, a defendant must show that "the error affected his substantial rights by prejudicially influencing the outcome of the district court proceedings." United States v. Webster, 84 F.3d 1056, 1066 (8th Cir. 1996).

Guerra now claims plain error in the court's allowing: (1) the prosecutor to elicit testimony regarding Guerra's status as an illegal alien; that to manufacture methamphetamine the chemical Ephedrine is needed; that Ephedrine can be obtained in Mexico, that large quantities of Ephedrine were being brought from Mexico into the United States; and that many Mexican Nationals manufacture methamphetamine; (2) the prosecutor's comment in closing that Montero, the coconspirator who did not testify, is another person who could tell us about Guerra's guilt; and (3) a police officer's testimony which allegedly vouched for the credibility of other coconspirators.

12

**A.    Testimony as to Ethnic Characteristics and Comment as to Status as an Illegal Alien**

In opening statement, the prosecutor stated,

And the booking sheet, we expect to show you, is that Guerra was an illegal alien in the State of California and the United States, without proper permission, or without a green card. . . . And that he can tell you that it takes Ephedrine — as Special Agent Gregory and Nance and any law enforcement officer that is connected with the investigation of methamphetamine — that you have to have the chemical Ephedrine to produce the methamphetamine. And that Ephedrine comes from Mexico.

(Tr. 1-60).

No objection was made by defense counsel to this statement. The prosecutor also proceeded to ask the following questions without any objection from defense counsel:

Q.    Mr. Price: You asked him whether he was a United States citizen, is that correct?
A.    Officer Hammer: Yes.
Q.    And what was his response?
A.    That he was from Mexico.
Q.    Did you ask him whether he had an address in the United States?
A.    Yes.
Q.    And what address did he give you?
A.    He said he lived at an unknown address in the City of Huntington Park, which conflicted with other statements made.
Q.    Okay. Did you determine whether or not he was employed at that time?
A.    Said he was unemployed.
Q.    Did you determine whether or not he had what is commonly referred to as a green card?
A.    I don't believe he had any green card.
Q.    As a resident alien?
A.    Yes.
Q.    He did not.
A.    He did not to my recollection.

13

(Tr. 3-292 to 3-293).  The government also elicited testimony at trial that large quantities of Ephedrine are being brought from Mexico into the United States and that large quantities of methamphetamine are being produced by Mexican Nationals.  (Tr. 4-94, 4-118). Deputy Sheriff Don Yoder testified that Mexican Nationals have the capability of cooking a hundred pounds of methamphetamine in a day. (Tr. 4-95).

As we have indicated, whether Guerra was a citizen or not, and whether he was in this country legally or not, had nothing to do with his drug trafficking.  In the circumstances of this case, however, we believe that the prosecutor's remarks in his opening statement and his questions to Officer Hammer on the subject of Guerra's alienage were not plain error.

## B.    Vouching for Coconspirator Who Did Not Testify at Trial

Guerra also alleges that the district court committed plain error in allowing the prosecutor to vouch for a coconspirator who did not testify. Guerra now objects to the following statements made by the prosecutor in his closing argument:

> And Montero, ladies and gentlemen, is the only other person that we know, other than Cordova and the others that we had testify, that knows for sure about the defendant.  And, ladies and gentlemen, we think you know that he knows for sure that the defendant is a coconspirator, and that he was there on those two occasions, just like Cordova said he was. . . . (Tr. 5-25 to 5-26).  Now, that is not to suggest that Brandy Cordova is the heavy here, because Brandy Cordova is the person that took the witness stand, that appeared in Court, and told you exactly what happened.  Montero did not.  Montero is the only other person that could tell you that the defendant is guilty in this matter, if we had him here.

14

(Tr. 5-50).  This court recognizes that it is error for a prosecutor to tell the jury what the testimony of a witness who did not testify would have been.  See United States v. Palmer, 37 F.3d 1080 (5th Cir. 1994), cert. denied, ___ U.S. ___, 115 S. Ct. 1804, 131 L. Ed. 2d 730 (1995). A closing argument should be based upon the facts in evidence and reasonable inferences therefrom and should not assert factual propositions for which there are no evidentiary support.  United States v. Boyce, 797 F.2d 691, 694 (8th Cir. 1986) (citing United States v. Ojala, 544 F.2d 940 (8th Cir. 1976)).  We do believe that the prosecutor's statement that "Montero is the only person that could tell you that the defendant is guilty in this matter, if we had him here" is at least a subliminal reference to an absent witness's testimony and was error. In the context of the evidence, however, it did not constitute plain error.

**C.    Government Witness Vouches for Credibility of Other Witnesses**

Guerra also alleges that it was plain error to allow a government witness to "vouch for the credibility of the coconspirators."  Special Agent Gregory testified as follows:

> Q.    Mr. Price: Now, Special Agent Gregory, after these proffered statements were obtained, did you in fact advise my office that you were accepting the information, and that we wanted to work out some type of plea agreement with Mr. Cordova and Dianne Whyde?
> A.    Special Agent Gregory: Yes, sir —
> Q.    Yes, I am sorry.
> A.    Based on the interview and the statements that they made, I believed them to be truthful and forthcoming with the information that they gave to us.

15

(Tr. 2-60 to 2-61).  Government counsel may inquire as to the terms of a plea agreement with other codefendants.  The test, of course, is relevancy. Agent Gregory's testimony was not responsive to government counsel's questions.  We do not believe that the substantial rights of Guerra were prejudiced by this offhand remark. <u>Swanson</u>, 9 F.3d at 1357 (court need not consider if error was committed given that "no substantial rights were prejudiced by the admission of the evidence").

We are nonetheless disturbed by the conduct of the prosecutor in this case. While he may not have crossed the line to prosecutorial misconduct, he certainly was on the line. Particularly in view of the sufficiency of the evidence, he need not have done so.  Overzealous prosecutors sometimes forget that the prosecutor's special duty is not to convict, but to secure justice.  <u>United States v. O'Connell</u>, 841 F.2d 1408, 1428 (8th Cir. 1988), <u>cert. denied</u>, 488 U.S. 1011, 109 S. Ct. 799, 102 L. Ed. 2d 790 (1989) (citing <u>United States v. Peyro</u>, 786 F.2d 826, 831 (8th Cir. 1986)). The cause of justice would be well served if prosecutors would heed the 1935 admonition by the Supreme Court:

> He [she] may prosecute with earnestness and vigor— indeed, he [she] should do so. But, while he [she] may strike hard blows, he [she] is not at liberty to strike foul ones. It is as much his [her] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

<u>Berger v. United States</u>, 295 U.S. 78, 88, 55 S. Ct. 629, 633, 79 L. Ed. 1314 (1935).

### V.  Post-<u>Miranda</u> Statements

Guerra argues that Detective Lupercio should not have been allowed to testify to statements which he believes implied that Guerra chose to remain silent.  Lupercio testified that Montero was read his rights in Spanish and that he waived those rights.  Lupercio then testified that during the interview Montero denied any wrongdoing and that Guerra was only at the location because he was trying to sell Montero a car.

Guerra also objects to the following testimony:

> Q.  Mr. Price: The defendant, in his — after you read him his Miranda rights, and after he waived those rights to talk with you initially —
> A.  Officer Lupercio:  Um-hum.
> Q.  — at that period of time, he didn't tell you that he came there with the car, did he, to buy it?
> A.  No, he did not.
> Q.  He never said anything like what Montero said, or what the juvenile had told you with regard to checking the car out?
> A.  True.
> Q.  And yet isn't it fair to say that Montero is the one that told you that that is why they were there at Bertino's is to check the car out, because the driver, Guerra, had brought it there?
> A.  Yes.
> Q.  And Guerra never said anything about that during his?
> A.  No. But the juvenile did.

(Tr. 4-89 to 4-90).  In the testimony now objected to by Guerra, no direct comment was made by the prosecutor to the jury regarding Guerra's silence.

We have searched the record and are unable to conclude that Guerra's claims as to post-<u>Miranda</u> statements merit reversal. At best, they amount to statements of marginal relevancy, adding

17

nothing to the merits of the government's evidence. Guerra is not entitled to a perfect case—only a fair one. We find no unfairness in the instance of this testimony.

## VI. Quantity of Drugs

Guerra objects to the district court's determination that 15-20 pounds of methamphetamine were attributable to him. At sentencing, the government must prove the drug quantity by a preponderance of the evidence. United States v. Campos, 87 F.3d 261, 263 (8th Cir.), cert. denied, __ U.S. ____, 117 S. Ct. 536, 136 L. Ed. 2d 420 (1996). "Defendants who challenge the sentencing court's determination of drug quantity face an uphill battle on appeal because we will reverse a determination of drug quantity only if the entire record definitely and firmly convinces us that a mistake has been made." United States v. Sales, 25 F.3d 709, 711 (8th Cir. 1994). "A district court's decision on the amount of drugs for which a defendant is to be held accountable is a finding of fact that must be accepted by a court of appeals unless clearly erroneous." United States v. Alexander, 982 F.2d 262, 267 (8th Cir. 1992), cert. denied, 512 U.S. 1244, 114 S. Ct. 2761, 129 L. Ed. 2d 876 (1994). See also United States v. McMurray, 34 F.3d 1405, 1415 (8th Cir. 1994), cert. denied, ___ U.S. _, 115 S. Ct. 1164, 130 L. Ed. 2d 1119 (1995). Guerra has the burden of proving that the district court's decision was clearly erroneous. Campos, 87 F.3d at 263.

According to the Sentencing Guidelines, a criminal defendant convicted of conspiracy may be held accountable for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G. § 1B1.3(a)(1)(B);

United States v. Rice, 49 F.3d 378, 382 (8th Cir.), cert. denied, ____ U.S. ___, 115 S. Ct. 2630, 132 L. Ed. 2d 870 (1995).

At sentencing the district court set forth specific findings of fact based upon review of his notes and the evidence in the case. (S.T. 12-16). We conclude that the record contains evidence linking Guerra to the distribution of the methamphetamine. The presentence report recommended that 15-20 pounds of methamphetamine were reasonably foreseeable by Guerra and thus attributable to him. Cordova testified at trial that Montero said he had access to as many pounds as Cordova or Jones wanted—maybe 30, 40 pounds. Also, of the specific transactions testified to by Cordova, Montero supplied Cordova with at least a pound of methamphetamine. The testimony revealed that Guerra had a substantial level of commitment to this conspiracy. See Rice, 49 F.3d at 382-83 (when determining if activity was reasonably foreseeable to defendant, court looked to whether "defendant demonstrated a substantial commitment to the conspiracy"). His commitment was so great that on the day of the buy-bust he went with Montero since it was a large drug buy involving substantial money. Guerra received a monetary benefit from the methamphetamine. Id. (when determining if activity was reasonably foreseeable to defendant, court looked to "whether defendant benefitted from coconspirators' activities"). On the day of the buy-bust, Montero supplied Cordova with three pounds of methamphetamine. The fact that this information was obtained from one of Guerra's coconspirators does not render the information unreliable. United States v. Kime, 99 F.3d 870, 885 (8th Cir. 1996), cert. denied, ___ U.S. ___, 117 S. Ct. 1015, ___ L. Ed. 2d ___ (1997). Given the actions of Guerra and the testimony at trial, it was reasonably foreseeable that Guerra knew that the drugs which he supplied to Cordova were being distributed to others. We are not definitely and firmly convinced that a mistake

was made in attributing 15-20 pounds of methamphetamine to Guerra. The court's findings are supported by the evidence.

## VII. U.S.S.G. § 3B1.1(a)

Pursuant to U.S.S.G. § 3B1.1(a), the district court added four levels to the base offense level of 34 based upon the finding that Guerra was an organizer or leader of a criminal activity involving five or more participants. U.S.S.G. § 3B1.1(a) provides: "If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by four levels."  We apply the clearly erroneous rule to the court's determination. See United States v. Turpin, 920 F.2d 1377, 1386 (8th Cir. 1990), cert. denied sub nom., 499 U.S. 953, 111 S. Ct. 1428, 113 L. Ed. 2d 480 (1991) (factual interpretations when applying the Sentencing Guidelines will not be disturbed unless the district court was clearly erroneous).

The terms "organizer" and "leader" are to be broadly interpreted. United States v. Miller, 91 F.3d 1160, 1164 (8th Cir. 1996).  For the enhancement to apply, the government need not prove that a defendant "directly controls" his coconspirators, but the government must prove that a defendant does more than sell for resale. Id.  The evidence at trial established that Guerra did more than "sell for the resale."  The government introduced testimony that Guerra exercised control in the sale of the methamphetamine.  Cordova testified that Montero's "main man" or "heavy" was named "Guerra," and that this "main man" could supply Cordova with 30 to 40 pounds of methamphetamine.  On the day of the buy-bust, Guerra, who drove the car, accompanied Montero because he was shepherding the amount of money involved.  We conclude that the district court's enhancement based upon its finding that Guerra was

20

a leader or an organizer of criminal activity involving five or more participants was not clearly erroneous.

## VIII. Conclusion

For the foregoing reasons, the conviction and sentence of Guerra are affirmed.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.

21