**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

_____

No. 96-1513

_____

United States of America,            *
                                     *
            Plaintiff-Appellee,      *
                                     *
    v.                               *
                                     *
Francis Weekly, also known as        *
Frank, also known as Beverly,        *
                                     *
            Defendant-Appellant.     *


_____                    Appeals from the United States
                               District Court for the
No. 96-1516                    Eastern District of Missouri.

_____

United States of America,            *
                                     *
            Plaintiff-Appellee,      *
                                     *
    v.                               *
                                     *
Ken Braddock,                        *
                                     *
            Defendant-Appellant.     *


_____

No. 96-1532

_____

United States of America,         *
                                         *

       Plaintiff-Appellee,      *
                                         *

           v.              *
                                         *

Donna Romero,            *
                                       *

       Defendant-Appellant.    *


_____

Submitted:  September 11, 1996

Filed:  May 23, 1997
_____

Before BOWMAN, BRIGHT, and JOHN R. GIBSON, Circuit Judges.


_____

JOHN R. GIBSON, Circuit Judge.

Francis Weekly, Ken Braddock, and Donna Romero pleaded guilty to one count of conspiring to distribute and/or possess with the intent to distribute heroin and cocaine in violation of 21 U.S.C. § 846 (1994).  Braddock and Weekly appeal their sentences, attacking the quantity of heroin on which the district court based their sentences.  Romero also appeals her sentence, arguing that the district court erred in denying her the benefit of the safety valve provision of 18 U.S.C. § 3553(f) (1994) and U.S.S.G. § 5C1.2 (1995), and in allowing hearsay testimony at her sentencing hearing.

We affirm the sentences.[1]

Because the issues raised in this appeal are limited to issues of sentencing, we need not discuss in detail the facts giving rise to the charges and guilty pleas. Suffice it to say, on December 22, 1994, Weekly, Braddock, and Romero, along with eighteen other individuals, were charged in a thirteen-count indictment with various drug offenses. The offenses involved a cocaine and heroin ring in St. Louis, Missouri, headed by Lamond Sykes. Of the twenty-one individuals named in the indictment, all but six had entered guilty pleas by the time we heard these appeals.

## I.

Braddock and Weekly pleaded guilty to one count of conspiring to distribute an unspecified amount of heroin and cocaine. The presentence report attributed twenty-eight kilograms of heroin and 595.35 grams of cocaine to them both. They objected to the quantity determination, and the district court conducted sentencing hearings. Following the hearings, the district court found that Braddock and Weekly should be sentenced based on the amounts contained in the presentence reports. The court then sentenced Weekly to 188 months imprisonment, and Braddock to 210 months imprisonment.

The district court determines the quantity of drugs involved in the conspiracy which is attributable to each defendant. See United States v. Flores, 73 F.3d 826, 833 (8th Cir.), cert. denied, 116 S. Ct. 2568 (1996). The quantity determination is a finding of fact that we will only reverse for clear error. See United States v. Alexander, 982 F.2d 262, 267 (8th Cir. 1993), cert. denied, 114 S. Ct. 2761 (1994). A defendant convicted of conspiracy can be accountable for drug quantities implicated in the

_____

[1]The Honorable Catherine D. Perry, United States District Judge for the Eastern District of Missouri.

conspiracy that are reasonably foreseeable to him.  See <u>United States v. Montanye</u>, 996

F.2d 190, 192 (8th Cir. 1993) (en banc) (citing U.S.S.G. § 1B1.3(a)(1)(B)), cert. denied, 117 S. Ct. 318 (1996).  The district court may base a defendant's sentence on drugs attributed to his co-conspirators if it finds, by a preponderance of the evidence, that the co-conspirators' activities were in furtherance of the conspiracy and were either known to the defendant or were reasonably foreseeable to him.  See United States v. Rogers, 982 F.2d 1241, 1246 (8th Cir.), cert. denied, 509 U.S. 912 (1993).  Relevant to the determination of reasonable foreseeability is whether and to what extent the defendant benefitted from his co-conspirator's activities, and whether the defendant demonstrated a substantial level of commitment to the conspiracy.  See United States v. Rice, 49 F.3d 378, 382-83 (8th Cir.), cert. denied, 115 S. Ct. 2630 (1995).

Braddock and Weekly argue that the district court clearly erred in finding them responsible for the entire amount of heroin attributed to the conspiracy (twenty-eight kilograms) because the entire amount was not reasonably foreseeable to them.  See United States v. Smith, 13 F.3d 860, 867 (5th Cir.), cert. denied, 114 S. Ct. 2151 (1994) ("A conviction for conspiracy does not automatically mean that every conspirator has foreseen the total quantity of drugs involved in the entire conspiracy.")  They contend that the district court relied on very general evidence to establish their involvement in the conspiracy, and that the district court should have sentenced them on the basis of a quantity determination of less than ten kilograms.  See U.S.S.G. § 2D1.1(c) (Nov. 1995).

In addition, Weekly contends that there was no independent testimony of the scope of his involvement in the conspiracy, only the hearsay testimony of DEA Special Agent Donald Mendrala.  Weekly does not dispute that he was part of the conspiracy, but refutes the suggestion that he broke down heroin, complaining that there is no physical evidence indicating he was involved in this aspect of the conspiracy.  He further complains that although Mendrala referred to conversations elicited from wiretaps and interviews with co-defendants, the government failed to introduce evidence of the wiretap transcripts, notes of Mendrala's interviews of co-defendants,

or any other witnesses corroborating Mendrala's testimony. Braddock raises similar complaints and specifically objects to the government's failure to provide Mendrala's notes of his conversations with co-defendants.

The district court did not clearly err in finding Braddock and Weekly responsible for the entire amount of the heroin attributable to the conspiracy. Weekly stipulated that he was part of the charged conspiracy that began in the fall of 1991. He further stipulated that he assisted in the distribution of heroin to primary distributors, communicated with Sykes about the distribution, and received compensation for his role in the conspiracy. Likewise, Braddock stipulated that after his release from prison on October 19, 1992, he packaged heroin for distribution, distributed heroin, and collected money from the distribution of heroin. In addition, the government presented testimony from Mendrala, the case agent for the Sykes narcotics investigation. Mendrala testified about the electronic surveillance conducted during the investigation, explaining that the government intercepted approximately 10,000 conversations, of which at least ninety percent were narcotics related. Mendrala also testified about his interviews with several of the co-defendants who sought the benefit of a reduction in their sentences. Based on the surveillance and interviews, Mendrala believed that the conspiracy distributed just under twenty-eight[2] kilograms of heroin. He calculated this amount by concluding that the conspiracy distributed a minimum of one ounce of heroin per day from the fall of 1991 through December of 1994.

Braddock and Weekly do not argue that the twenty-eight kilogram amount is overstated as to the conspiracy; instead, they complain that there is no specific evidence linking them to the twenty-eight kilogram amount. However, the government

_____

[2]The district court recognized that Braddock did not get out of the penitentiary until October of 1992. It concluded, however, that the evidence showed that Braddock joined the conspiracy in late October or early November of 1992, and that even assuming that Braddock was responsible for only half of the heroin, he would still be in the same guidelines range. See U.S.S.G. § 2D1.1(c).

need only prove that the twenty-eight kilogram amount generated by the conspiracy was reasonably foreseeable to Braddock and Weekly. See Montanye, 996 F.2d at 192. The court may rely on hearsay testimony as long as the evidence has sufficient indicia of reliability to support its probable accuracy. See United States v. Cassidy, 6 F.3d 554, 557 (8th Cir. 1993). The evidence showed that Weekly and Braddock benefitted from the conspiracy and were substantially committed to the conspiracy. See Rice, 49 F.3d at 382. There was evidence that Weekly distributed heroin to low-level dealers, and that Braddock worked as a street-level distributor. There was also testimony that the primary role of Braddock and Weekly in the conspiracy was to package the heroin for sale by mixing it with diluting agents. Mendrala testified that during the course of surveillance he saw Weekly repeated times, and that he specifically recounted two undercover purchases involving Weekly. Mendrala also testified that Sykes paid Weekly and Braddock $1,000 each time they diluted the heroin, and that a "small group of people," including Weekly and Braddock, were responsible for packaging the drugs for retail sale. We see no reason why the court could not rely on Mendrala's testimony. See, e.g., United States v. Knight, 96 F.3d 307, 310 (8th Cir. 1996), cert. denied, 117 S. Ct. 1458 (1997). United States v. Campos, 87 F.3d 261, 264 (8th Cir.), cert. denied, 117 S. Ct. 536 (1996). The government provided Braddock and Weekly with the DEA reports, 200 hours of wiretaps, and wiretap affidavits. The government was not required to turn over Agent Mendrala's notes of his impressions from his interviews with co-defendants. See, e.g., United States v. Malone, 49 F.3d 393, 396 (8th Cir.), cert. denied, 116 S. Ct. 208 (1995).

We affirm the sentences of Braddock and Weekly.


## II.


Donna Romero pleaded guilty to transporting a quantity of heroin from Phoenix, Arizona, to St. Louis, and it was stipulated that she would be accountable for the 256.8

grams of heroin she transported. She was given a three-point reduction for acceptance of responsibility, making her offense level twenty-three. Based upon this offense level and a criminal history Category of I, the guideline imprisonment range was from forty-six to fifty-seven months. The statutory minimum sentence was sixty months, and so she was sentenced to sixty months. Romero first argues that the district court clearly erred in denying her the benefit of the safety-valve provisions of 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2 (1995). Like Weekly and Braddock, Romero further argues that the district court erroneously admitted hearsay testimony at her sentencing hearing and that the government failed to provide discovery regarding evidence admitted by the court at sentencing. She contends these errors deprived her of her Sixth Amendment right to confront her accusers.

## A.

After Romero pled guilty, the probation office prepared a "Disclosure Copy" of her presentence report. The report stated that "since it appears that [Romero] meets the criteria of 18 U.S.C. § 3553(f)(1)-(5), the Court may impose a sentence in accordance with the applicable guidelines without regard to the statutory minimum sentence pursuant to Section 5C1.2."

The government objected to the report, and the probation office prepared an "Addendum to the Presentence Report" and then changed the final report. The Addendum stated:

> [T]he government has received information that Romero was possibly more involved in the instant offense more [sic] than outlined in the presentence report. As a result, the government has requested that [Romero] submit to a polygraph test. Romero has refused to comply with said request. As a result, the government believes that [Romero] has not truthfully provided all information and evidence that she has concerning the offense . . . . It is the position of the probation office that the

government has the responsibility of determining whether the defendant

has met the criteria set for (sic) in Section 5C1.2(5). As the government does not believe that she satisfied said criteria, the presentence report has been revised. . . .

Romero objected to the revisions made in the report, complaining that the revisions could not be made after she "accepted" the report. The court overruled her objection, and then allowed Mendrala to testify about statements made by a co-conspirator, Antonio Grajeda (Romero's husband), and a polygraph examiner, Benjamin Scott.

After the guilty pleas, Mendrala interviewed both Grajeda and Romero concerning their role in the conspiracy. Grajeda told him that he was recruited because he was, at times, an over-the-road truck driver, and that his father-in-law, mother-in-law, and Romero, set up the delivery. He stated that he traveled to St. Louis to assist in the driving and to be with his family. He told Mendrala that the group had met on one occasion at his father-in-law's in Phoenix where they discussed the plans to drive the heroin to St. Louis. He admitted that he knew the heroin was in the car but that he did not know exactly where it was hidden in the car. He told Mendrala that his father-in-law had put the heroin in the car and told Romero where it was hidden. Once they got to the Days Inn motel in Eureka, Missouri, Romero told him that the heroin was in the center console of the car. Grajeda also admitted that he had been with Romero and his father-in-law when other distributions of heroin took place in the Phoenix area.

Mendrala's interview with Romero following her guilty plea told a different story. She told Mendrala that her father-in-law and Grajeda devised the idea to transport the heroin to St. Louis, and that Grajeda asked her to come along at the last minute to throw off a profile stop by a law enforcement along the way. She stated that she did not know of the heroin delivery although she knew that "they might have been doing something wrong." Mendrala also testified that during the electronic surveillance, several conversations between Sykes and Romero were recorded, and that he felt that Romero knew more about the drug operation than what she admitted.

-10-

Because of the conflicting statements of Grajeda and Romero, the government asked both to take a polygraph examination. Mendrala testified that Grajeda agreed to take the polygraph examination, and that Special Agent Benjamin Scott administered a polygraph examination to Grajeda. Scott told Mendrala that the results of the exam indicated that Grajeda was truthful. Mendrala further testified that Romero refused to take a polygraph examination.

After this testimony, the court found that Romero failed to meet her burden of showing that she was eligible for departure under the safety-valve provisions of 18 U.S.C. § 3553(f)(1)-(5) and U.S.S.G. § 5C1.2.

Under the safety-valve exception to statutory minimum sentences, a defendant may be given a more lenient sentence within the otherwise applicable guidelines range if, among other things, the defendant "truthfully provide[s] to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan." U.S.S.G. § 5C1.2(5). A defendant has the burden to show, through affirmative conduct, that he has given the government truthful information and evidence about the relevant crimes before sentencing. See United States v. Romo, 81 F.3d 84, 85 (8th Cir. 1996). We review the district court's finding that Romero did not satisfy her burden for clear error. Id.

The district court found that Romero had failed to show that she was entitled to the safety-valve provisions under section 5C1.2, as she had not shown that she truthfully provided to the government all information she had concerning the offense. The court stated that a defendant would not be required to submit to a polygraph examination in all cases, but reasoned that Romero's refusal to submit to a polygraph examination in light of the conflict with Grajeda's statement supported a finding that Romero did not provide truthful information. The court stated there were other grounds for its finding, as well. There was no request at sentencing that the district

judge articulate with specificity these alternative grounds. Although the judge did not specifically articulate its alternative bases, there was certainly sufficient evidence that there were grounds besides the refusal to take the polygraph examination to support the district court finding that Romero had not truthfully provided all information that she had concerning the offense. Indeed, the court had just concluded an evidentiary hearing in which Mendrala had testified in detail to the conflicts between the testimony of Grajeda and Romero and to wiretap evidence suggesting Romero's involvement in the offense. This conflict in the evidence alone is independent evidence to support the district court's finding that Romero had not truthfully provided all information that she had concerning the offense, and points to the inference drawn by the court that Romero, not Grajeda, was untruthful. The district court finding that Romero did not meet her burden of showing that she truthfully provided the government all information about the offense is not clearly erroneous.

**B.**

Romero also contends that the district court erred in admitting the hearsay statements testified to by Mendrala. She contends that there was no basis for concluding that Grajeda's statements were reliable, and that the government failed to provide "discovery" regarding the statements of Scott, the polygraph examiner. She believes the admission of this testimony violated her Sixth Amendment right to confront her accusers.

There is, however, no right of confrontation in the sentencing process. See, e.g., United States v. Hammer, 3 F.3d 266, 272 (8th Cir. 1993), cert. denied, 510 U.S. 1139 (1994); United States v. Wise, 976 F.2d 393, 400-01 (8th Cir. 1992) (en banc), cert. denied, 507 U.S. 989 (1993). "The Guidelines permit the use of hearsay evidence to resolve disputed facts 'provided that the information has sufficient indicia of reliability to support its probable accuracy.'" Caseate, 6 F.3d at 557 (citing U.S.S.G. § 6A1.3(a)). In Wise, we specifically held that the use of hearsay evidence did not violate the

-12-

Confrontation Clause. See 976 F.2d at 402. The hearsay testimony in Wise was more attenuated than that here. See id. at 396. Furthermore, Romero had the opportunity to cross-examine Mendrala regarding his interviews with Grajeda and Scott, and Romero has not provided a specific reason as to why Mendrala's testimony was unreliable.

Finally, Romero expands her argument by stating that had the government produced these witnesses in court, that she would have been entitled to discovery under Federal Rule of Criminal Procedure 16, Brady v. Maryland, 373 U.S. 83, 87 (1963), and the Jencks Act. Romero, however, fails to distinguish her sentencing hearing from a trial and does not suggest that any statements exist which are exculpatory to her. See, e.g., Alone, 49 F.3d at 396 & nn.4-5. No discovery violation occurred.

We affirm the sentences of Weekly, Braddock, and Romero.

BRIGHT, Circuit Judge, dissenting.

I dissent.

This case provides a typical, yet disturbing glimpse into the underbelly of prosecuting non-violent, first time drug offenders under mandatory minimum sentences. The district court sentenced Donna Romero, a first time offender and the mother of three young children, to a five-year mandatory minimum term of incarceration. Her request for a reduced sentence under the safety valve provision of 18 U.S.C. § 3553(f) and U.S.S.G. § 5C1.2 was denied. In my view, this case should be remanded for resentencing because the sentencing judge relied on irrelevant evidence of a lie detector test to deny Romero application of the safety valve.

Romero and Grajeda transported drugs from Phoenix to St. Louis. Romero told the authorities that she did not organize or plan this trip, but merely accompanied

Grajeda at his request. Romero acknowledged that she knew they were doing something illegal.

Romero sought relief from a five-year mandatory minimum sentence for this first offense by requesting application of the safety valve provision. Initially, Romero appeared to meet the requirements of the safety valve provision and the presentence report recommended its application in her case. The safety valve provides that a defendant must not have more than one criminal history point, must not use violence during the commission of the offense, the offense must not result in serious physical injury, the defendant must not be an organizer of the offense, and the defendant must truthfully provide all relevant information to the government regarding the offense. 18 U.S.C. § 3553(f). Application of the safety valve provision permits a district judge to sentence a defendant below the statutory mandatory minimum, but within the Sentencing Guideline Range. In this case, Romero could be sentenced between forty-six and fifty-seven months in prison.

Grajeda, the apparent husband of Ms. Romero and the father of two of her young children, had a different view of the circumstances. He asserted that Romero was responsible for transporting the drugs and that he merely joined her for the ride. In an apparent attempt to resolve the conflicting stories of Romero and Grajeda, the prosecutor arranged for Grajeda to take a lie detector test. Romero, on advice from counsel, declined to submit to a test. After Grajeda "passed" the lie detector test, the prosecutor opposed application of the safety valve provision for Romero and objected to the presentence report. Eventually the probation office prepared an "Addendum to the Presentence Report" recommending, based on the government's objection, that the court not apply the safety valve provision to Romero.

The district court relied exclusively upon Grajeda's polygraph in denying

Romero the safety valve.[3]   The reliability of polygraph evidence has long been considered suspect, <u>Brown v. Darcy</u>, 783 F.2d 1389, 1394-97 (8th Cir. 1986), and its admission into evidence is rarely granted.  <u>See, e.g.</u>, <u>United States v. Williams</u>, 95 F.3d 723, 728-730 (8th Cir. 1996) (affirming denial of admission of polygraph into evidence).  In the rare instance where it is utilized, courts require careful foundation such as a qualified polygraph expert and appropriate questioning.  <u>See, e.g.</u>, <u>United States v. Kwong</u>, 69 F.3d 663, 668 (2d Cir. 1995) (polygraph results inadmissible because "the questions posed to Kwong were inherently ambiguous no matter how they were answered"), <u>cert. denied</u>, 116 S. Ct. 1343 (1996).  The prosecution presented no such foundation here.

Let us review the relevance of Grajeda's lie detector test which was the focus of a hearing prior to sentencing.  The polygraph examiner never testified.  The government offered no evidence regarding the qualifications, if any, of the examiner.  No report was presented to the district court.  It is unknown if the examiner even made a report. Sent. Tr. at 27.  We do not know the questions the examiner asked Grajeda, sent. tr. at 27-28, or Grajeda's answers.  Indeed, the only testimony relating to the polygraph examination came from an individual, Agent Don Mendrala, who allegedly spoke with the examiner by telephone.  The entire testimony on direct examination relating to the polygraph test is as follows:

> Q.    Who administered the polygraph examination?
> A.    Special Agent Ben Scott, Benjamin Scott.
> Q.    And his duties, he is employed by whom?
> A.    Employed by DEA as a polygraph examiner.  At the time he was assigned to our New Orleans office.

[At this point, defense counsel objected to the line of questioning, but was apparently overruled.  The questioning continued]

---

[3]Although the district court initially stated that it denied the safety valve "on several bases", sent. tr. at 32, the court only mentioned the polygraph examination.

A. Currently assigned to our Washington D.C. office.

Q. And he traveled to St. Louis and administered a polygraph examination of Mr. Grajeda regarding his role in the offense, is that correct?

A. That's correct.

Q. And based upon your conversations with Ben Scott, the examiner, did he render an opinion as to whether or not Mr. Grajeda passed or was telling the truth during that examination?

A. He indicated to me that he was truthful.

Q. And that no deception was indicated?

A. None at all.

Q. That's all, Judge.

Sent. Tr. at 25.

At sentencing, of course, the usual federal rules of evidence do not apply. But the evidence presented in this case lacked any trustworthiness or reliability whatsoever. In a word, the "evidence" of Grajeda's lie detector test was worthless. As such, it was entitled to no consideration by the district judge.

Moreover, Grajeda's obvious intent to sacrifice his wife and children resulted from the actions and inducements of the prosecutor. The prosecutor's conduct is but another example of United States Attorneys in drug cases who turn family member against family member with the result invariably being the destruction of the family and harm to the children. A recent article in The Atlantic Monthly provided an example of such a situation:

> Federal prosecutors in Montana threatened her [Israel] with a long prison sentence. Although Israel possessed only eight ounces of marijuana at the time of her arrest, under the broad federal conspiracy laws she could be held liable for many of her husband's crimes. Israel was thirty-one years old, the mother of four young children. She had never before been charged with any crime. Judge Jack Shanstrom

-16-

warned her in court that without a promise of cooperation "you are not going to see your children for ten plus years." Nevertheless, Israel refused to testify against her husband. She was sentenced to eleven years in federal prison without parole. Her husband was sentenced to twenty-nine years without parole. Her children were scattered among various relatives.

Eric Schlosser, "More Reefer Madness", The Atlantic Monthly, Apr. 1997, at 96. In our case, an overzealous prosecutor pitted father against mother in order to incarcerate the latter for a lengthier time. When Romero refused to take a lie detector test, the prosecutor did not simply retract his recommendation for the safety valve provision. Instead, he pursued a harsher sentence for obstruction of justice, as if a five-year sentence for this first offender was somehow insufficient punishment. Of course, it is the children who suffer for turning "family values" on its head in this fashion. Fortunately, the district court properly denied the government's request for an obstruction of justice adjustment. Sent. Tr. at 33.

The sad outcome of this case results from a sentencing structure which improperly confers immense power upon the prosecutor. He or she exercises almost complete control over the sentencing process by determining what charges to pursue and whether to disagree with the recommendation contained in the presentence report. As this case demonstrates, the prosecutor, not bound by the rules of evidence, is free to introduce worthless evidence to "prove" a point regardless of its relevance. Unfortunately, "[o]verzealous prosecutors sometimes forget that the prosecutor's special duty is not to convict, but to secure justice." United States v. Guerra, No. 96-2235, 1997 WL 232261, at *8 (8th Cir. May 9, 1997) (citations omitted).

The trial judge, on the other hand, is confined by the sentencing guidelines, the criminal code, the presentence report and the charges filed by the prosecutor. In short, the sentencing judge has little flexibility to do what he or she thinks is right.

Furthermore, if the judge departs downward, prosecutors will often take an appeal.  In

my experience, the federal courts of appeal all too often side with prosecutors and not the district judges in these situations.

In my view, sentencing in many federal drug cases is unworthy of American justice, and it pains me that our citizens are sentenced to lengthy prison terms under circumstances such as those presented here. What is most disturbing, perhaps, is that this case is not unusual in any significant respect from the seemingly endless drug cases we review. It is precisely the ordinariness of the manner in which we lock away Donna Romero for five years that appalls me. In the end, it is simply another example of overzealous prosecution, excessive mandatory sentences, the use of improper evidence and the destruction of families that results from this country's treatment of its non-violent drug offenders.

A recent study by the Drug Policy Center of the Rand Corporation, representing the first detailed examination of the cost effectiveness of mandatory minimum sentences, concluded that "Mandatory minimum sentences are not justifiable on the basis of cost-effectiveness at reducing cocaine consumption or drug-related crimes[.]" Study Questions Costs of Shift to Harsher Cocaine Sentences, N.Y. Times, May 13, 1997, at A13; see also United States v. Hiveley, 61 F.3d 1358, 1363-66 (8th Cir. 1995) (Bright, J., concurring). This case causes me to reflect on the words of the great English legal philosopher Jeremy Bentham: "Every particle of real punishment that is produced, more than what is necessary, is just so much misery run to waste." Jeremy Bentham, Principles of Penal Law, 1 The Works of Jeremy Bentham 398 (John Bowring ed., 1962). I encourage the United States Attorneys who prosecute drug cases to type these words on a three by five card and tape it to their desks.

Therefore, I would reverse and remand for resentencing.

A true copy.

Attest:

   CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.