# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3478

_____

United States of America,

        Appellee,

v.

Euka Wadlington,

        Appellant.

Appeal from the United States District Court for the Southern District of Iowa.

_____

Submitted: May 9, 2000
Filed: December 1, 2000

_____

Before RICHARD S. ARNOLD and HEANEY, Circuit Judges, and MAGNUSON,[1] District Judge.

_____

MAGNUSON, District Judge.

Euka Wadlington was convicted of conspiracy to possess and distribute cocaine and cocaine base and attempted distribution of cocaine. He was thereafter sentenced to life imprisonment. He now appeals, attacking both his conviction and sentence. For the reasons stated below, we affirm.

_____

[1]The Honorable Paul A. Magnuson, Chief Judge, United States District Court for the District of Minnesota, sitting by designation.

## I. BACKGROUND

On December 3, 1998, a federal grand jury empaneled in the Southern District of Iowa returned an indictment against Appellant Euka Wadlington ("Wadlington"), charging him with conspiracy to possess and distribute cocaine and cocaine base and actual distribution of cocaine base, in violation of 21 U.S.C. §§ 846 and 841(a)(1). Thereafter, the Grand Jury handed down two superseding indictments. The first included an additional charge against Wadlington for attempted distribution of cocaine, in violation of 21 U.S.C. §§ 841(a)(1) and 846,[2] and added Samuel L. Miller ("Miller"), Terrance Hood ("Hood"), and Lee Paige Driver ("Driver") to the conspiracy count. The second superseding indictment added Terrance McLoyd ("McLoyd") to the list of conspirators as well as another count against Driver. Although no new charges were brought against Wadlington, he was indirectly affected by the proceedings. Two of his former girlfriends, Juanita Ellis ("Ellis") and Luwanda Kelly ("Kelly"), both of whom were considered by him to be key defense witnesses, fully implicated him and others in the conspiracy when testifying before the Grand Jury.

Prior to being summoned to Iowa for the grand jury proceedings, both Ellis and Kelly were interviewed in their home states by government agents. Each denied having any direct knowledge of Wadlington's involvement with drugs, although both admitted knowing that he was a drug dealer. Certain that Ellis and Kelly could provide more specific information about the conspiracy's participants and activities, the prosecutor issued subpoenas summoning them to Davenport, Iowa, to testify before the Grand Jury

---

[2] On November 13, 1998, Wadlington was arrested during an attempted undercover drug sale. Government informant Mark Thomas arranged for Wadlington to sell one kilogram of cocaine to undercover agent Jon Johnson, who was posing as an Iowa drug dealer. The day the exchange was to be made, Wadlington arrived at a hotel outside of Chicago as planned and was immediately arrested. No drugs were found during the search of his person and vehicle.

on April 8, 1999. The prosecutor arranged for them to arrive in Iowa the morning of April 7, 1999. Upon their arrival, both witnesses met with attorneys provided by the Government. They were then questioned by the prosecutor and government agents with their counsel present.

After one or two hours of questioning, Kelly admitted having detailed information about Wadlington's drug operation, including the activities of his associates. She disclosed the information to the Grand Jury the following day. Kelly denies being threatened or coerced into making the incriminating statements and maintains that her testimony was truthful. Ellis was less inclined to provide incriminating information about Wadlington and his associates. Throughout interviews on April 7th, she continued to deny having any actual knowledge of Wadlington's drug dealing, even after failing a lie detector test. However, after speaking privately with her attorney the following afternoon, Ellis decided to fully divulge her knowledge of Wadlington's drug operation. Her attorney, Patrick Kelly, denies that the Government coerced her testimony.

On April 20, 1999, and again on April 26, 1999, Wadlington moved to dismiss the second superseding indictment, alleging prosecutorial misuse of the grand jury process. Wadlington also filed a motion to continue the trial to prepare his defense in light of Ellis' and Kelly's damaging testimonies. Finding no abuse of the grand jury process or misconduct by the Government in its investigation, the District Court[3] denied both motions.

---

[3] The Honorable Charles R. Wolle, United States District Judge for the Southern District of Iowa.

The case proceeded to trial on April 26, 1999.[4] Viewed in the light most favorable to the verdict, the evidence shows that from 1992 to approximately 1998, Wadlington was the leader in a drug organization that supplied cocaine and cocaine base to persons in Clinton, Iowa. Wadlington employed and supervised numerous persons who concealed, transported, prepared, and distributed the drugs. At least two of these individuals were juveniles. Government witnesses testified that the drug operation involved concealing cocaine in Tide detergent boxes and transporting the boxes from Chicago to several residences in Clinton where the drugs were cooked and distributed for re-sale in the Clinton area.

Wadlington was never caught with any drugs, either on his person or in his vehicle, home, or business. The Government relied entirely on the testimony of Wadlington's co-conspirators as well as others involved in the Clinton drug scene to establish his guilt. In defense, Wadlington sought to convince the jury that the Government's case was a fraud. To this end, he attempted to undermine the credibility of government witnesses by highlighting prior inconsistent statements and revealing their self-interest in providing incriminating evidence about him. The jury was apparently not entirely swayed by Wadlington's defense. On May 10, 1999, the jury returned a verdict convicting Wadlington on the conspiracy and attempted distribution counts and acquitting him on the actual distribution count. On August 5, 1999, the District Court sentenced Wadlington to concurrent life sentences and 10 years supervised release. Wadlington now appeals his conviction and sentence.

---

[4] Wadlington's co-defendants all pleaded guilty, either before or after Wadlington's trial. Others involved in the drug operation were indicted separately and either went to trial or pleaded guilty. See e.g., United States v. Puckett, 147 F.3d 765 (8th Cir. 1998).

## II.    DISCUSSION

### A.    Prosecutorial Misconduct.

On appeal, Wadlington alleges numerous instances of prosecutorial misconduct occurring at various times during the proceedings.  For the reasons stated below, we conclude that the cited instances do not, either individually or collectively, necessitate a new trial.

### 1.    Grand Jury Proceedings.

Wadlington advances three separate, but intertwined instances of alleged prosecutorial misconduct during grand jury proceedings, each of which he believes mandates reversal of his conviction.  At the outset we note that "[g]rand jury proceedings are afforded a strong presumption of regularity, and a defendant seeking to overcome that presumption faces a heavy burden."  United States v. Kouba, 822 F.2d 768, 774 (8th Cir. 1987).  Where the defendant has alleged prosecutorial misconduct, dismissal of an indictment is proper only when the defendant demonstrates flagrant misconduct and substantial prejudice.  See United States v. Manthei, 979 F.2d 124, 126-27 (8th Cir. 1992).  "[A]bsent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate."  United States v. Morrison, 449 U.S. 361, 365 (1981).  We will disturb a district court's denial of a motion to dismiss an indictment only upon a finding of abuse of discretion.  See Manthei, 979 F.2d at 126-27.

Wadlington first contends that Ellis and Kelly were improperly called to testify before the Grand Jury for the sole purpose of strengthening the Government's case against him.  The District Court found that this was not the case.  While the timing of this particular grand jury proceeding–20 days before Wadlington's trial–is somewhat

suspect, our review of the record reveals no abuse of discretion in the District Court's determination.

It is well-settled that it is improper to summon a witness before the grand jury "for the sole or dominant purpose of preparing a pending indictment for trial." Puckett, 147 F.3d at 770 (quoting United States v. Gibbons, 607 F.2d 1320, 1328 (10th Cir. 1979)). However, "where the purpose of the grand jury proceeding is directed to other offenses, its scope cannot be narrowly circumscribed and any collateral fruits from bona fide inquiries may be utilized by the government." United States v. Sellaro, 514 F.2d 114, 122 (8th Cir. 1973).

The Government maintains that although Ellis and Kelly provided incriminating information about Wadlington to the Grand Jury, they were subpoenaed for the primary purpose of providing information about his associates, in particular McLoyd. The record supports this assertion. Most notably, the grand jury investigation actually yielded an indictment against McLoyd without directly affecting the charges against Wadlington. Additionally, it does not appear that the Government needed the information Ellis and Kelly were able to provide about Wadlington as it had at least nine other witnesses with substantially the same information already scheduled to testify against him at trial.

Nevertheless, Wadlington believes the prosecutor's improper purpose is evinced by the fact that many of the questions posed related to his role in the conspiracy. After reviewing the grand jury transcripts, we must disagree. The proceedings were focused on developing further evidence about the conspiracy, in particular its participants. Because Wadlington was the leader of the conspiracy, it is not surprising that incriminating information was elicited about him in the process. Additionally, it was appropriate for the prosecutor to ask questions about Wadlington before delving into

the witnesses' knowledge about his associates because their knowledge stemmed in large part from their involvement with him.

Wadlington also believes that the prosecutor's improper purpose is apparent because neither Ellis nor Kelly were asked about McLoyd during initial police interviews. Thus, Wadlington argues, the prosecutor could not have expected to elicit information about him during grand jury proceedings. On the contrary, we find that given the closeness of their respective relationships with Wadlington during the time in which the conspiracy occurred, it was entirely reasonable for the prosecutor to believe that they had information about Wadlington's co-conspirators, among them McLoyd. Indeed, the prosecutor's belief was correct. Both witnesses were able to provide incriminating evidence about McLoyd to the Grand Jury. Wadlington maintains that the Grand Jury indicted McLoyd solely on the strength of the case agent's testimony rather than on the testimonies of Ellis and Kelly. Even if we were privy to the Grand Jury's deliberative process and were able to ascertain the veracity of Wadlington's assertion, such a fact would be of no moment. That a grand jury finds one witness' testimony conclusive does not render another witness' appearance an abuse of process.

Wadlington next agues that the prosecutor misused grand jury subpoenas to secure ex parte interviews with Ellis and Kelly. The Government rests on its authority to subpoena witnesses in advance of their presentation to the grand jury in order to allow for the efficient presentation of evidence and to save time for grand jurors. See United States v. Universal Mfg. Co., 525 F.2d 808, 811-12 (8th Cir. 1975) (holding that the Government may have advance access to documents and other evidentiary matter subpoenaed by or presented to a federal grand jury); see also In re Possible Violations of 18 U.S.C. §§ 201, 371, 491 F. Supp. 211, 213 (D.D.C. 1980) (holding that the Government may call a grand jury witness to its offices pursuant to subpoena on the day of grand jury proceedings for a consensual interview so that government attorneys

may identify the nature of the proposed testimony). Wadlington does not dispute the Government's authority in this regard. Instead, he contends that the prosecutor's purpose in this case was not to expedite the proceedings, but rather to coerce Ellis and Kelly into providing incriminating evidence about him.

It would strain credulity to find that the prosecutor summoned Ellis and Kelly to government offices for purely logistical purposes.[5] They were brought to Iowa one full day before the grand jury proceedings at which time they were provided counsel and subjected to a substantial amount of questioning. We believe that such circumstances indicate improper use of grand jury subpoenas. Rule 17(a) of the Federal Rules of Criminal Procedure states that a subpoena "shall command each person to whom it is directed to attend and give testimony at the time and place specified therein." This language has been interpreted to mean that witnesses may be subpoenaed to give testimony at formal proceedings, such as grand jury proceedings, preliminary hearings, and trials. See United States v. LaFuente, 991 F.2d 1406, 1411 (8th Cir. 1993); see also United States v. Keen, 509 F.2d 1273, 1274-75 (6th Cir.1975); United States v. Hedge, 462 F.2d 220, 222-23 (5th Cir.1972); United States v. Standard Oil, 316 F.2d 884, 897 (7th Cir. 1963). It does not authorize the Government to use grand jury subpoenas to compel prospective grand jury witnesses to attend private interviews with government agents. See LaFuente, 991 F.2d at 1411.

We are mindful that "such an abuse of process can form an important link in a chain of reversible prosecutorial misconduct." United States v. LaFuente, 54 F.3d 457, 461 (8th Cir. 1995). Nevertheless, we are reluctant to find reversible error absent

_____

[5] The record does not include the actual subpoenas issued to Ellis and Kelly, and it is not clear from the briefs whether the subpoenas summoned them to the grand jury proceedings on April 8th or to government offices on April 7th. In any case, the witnesses were brought to Iowa on April 7th under the auspices of the grand jury subpoena.

additional factors such as "badgering and intimidation" by the Government. Id. at 462. Although Wadlington contends that Ellis and Kelly were coerced into testifying falsely before the Grand Jury, the record does not support such a finding. Both witnesses were represented by counsel throughout the questioning–their interests and rights thus ostensibly protected. Furthermore, no convincing evidence indicates that anything inappropriate occurred during the interviews or that either witness actually lied to government agents or to the Grand Jury.

This leads us to Wadlington's final contention relating to the grand jury proceedings: that the prosecutor used the proceedings to violate his right to compulsory process by making Ellis and Kelly "unavailable" witnesses. Wadlington believes that they would have been key defense witnesses at trial had they not been subpoenaed to testify before the Grand Jury. After reviewing their earlier statements to government agents, we doubt that either Ellis or Kelly would have in fact been strong defense witnesses.[6] Nevertheless, a defendant has a right to present his own witnesses to establish a defense and that "[t]his right is a fundamental element of due process of law." Washington v. Texas, 388 U.S. 14, 19 (1967). However, this right will not be violated absent some force influencing defense witnesses not to testify. See Webb v. Texas, 409 U.S. 95, 98 (1972) (finding that the defendant's right to due process was violated when "the judge's threatening remarks, directed only at the single witness for the defense, effectively drove that witness off the stand."); see also United States v. Morrison, 535 F.2d 223, 228 (3d Cir. 1976) (holding that the defendant's right to due

_____

[6] While being interviewed by a government agent at her place of employment on March 29, 1999, Kelly made clear that she believed Wadlington to be a drug dealer. (See Def.'s Ex. F at 1.) She also agreed to help the Government with the case in any way she could. (See id. at 2.) Ellis' pre-subpoena statements were similarly damaging to the defense. During a January 7, 1999 interview with government agents, Ellis acknowledged that Wadlington was a drug dealer and that he had numerous associates working for him. (See Def.'s Ex. H.)

process was violated when the prosecutor influenced the defendant's key witness not to testify by repeatedly threatening her with prosecution and illegally summoning her to government offices where he further impressed upon her the dangers of testifying outside the presence of her counsel).  As previously noted, Wadlington has not established that such coercion or intimidation occurred in this case.

In sum, Wadlington has simply not demonstrated, as he must, that the District Court's denial of his motion to dismiss the indictment was in error.

2.      Pre-Trial Misconduct.

Under Brady v. Maryland, 373 U.S. 83, 87 (1963), the prosecution's suppression of requested evidence favorable to an accused "violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  A Brady violation will be found if:  1) the prosecutor suppresses the evidence after a request by the defendant; 2) the evidence was favorable to the defendant; and 3) the evidence was material to his defense.  See United States v. Steffen, 641 F.2d 591, 594 (8th Cir. 1981).  "Omitted evidence is material where it 'creates a reasonable doubt that did not otherwise exist.'"  Id.  (quoting United States v. Agurs, 427 U.S. 97, 112 (1976)).

Wadlington contends that the Government violated Brady by withholding the notes from initial interviews with government witnesses Luwanda Kelly, Tina Bostic, Raashaan Wilkins, and Terrance Hood and by withholding the DEA file of prosecution witness Sherman Bell, which he believes contains impeaching and exculpatory information.  While Wadlington admits that he was aware of the substance of the witnesses' statements at the time of trial, he argues that without having the actual notes he was so limited in his ability to cross-examine that he was denied due process.  The

District Court disagreed and denied Wadlington's motion to dismiss on this basis. We affirm.

Because Wadlington was already aware of the substance of the government witnesses' exculpatory and impeaching statements prior to trial, he cannot establish a Brady violation. See id. at 595 (noting that Brady does not apply to evidence already known by the defendant). As for Sherman Bell's DEA file, Wadlington has failed to establish that it actually included impeaching or exculpatory statements. We have made clear that "[m]ere speculation that materials may contain exculpatory evidence is not . . . sufficient to sustain a Brady claim." United States v. Van Brocklin, 115 F.3d 587, 594 (8th Cir. 1997).

Even if a Brady violation could be found, we are not convinced that the result of the trial would have been different had the material been made available. Although Wadlington was not provided the notes in question, he was aware of their substance and was thus able to undermine the credibility of each witness on cross-examination. We do not believe that having the actual notes would have generated such compelling cross-examination as to render an acquittal more likely.

3.    Trial Misconduct.

On appeal, we undergo a two-part analysis to determine whether prosecutorial remarks should have resulted in a mistrial. We first determine whether the "remarks were in fact improper and, if so, whether they prejudicially affected the defendant['s] substantial rights so as to deprive [him] of a fair trial." United States v. Figueroa, 900 F.2d 1211, 1215 (8th Cir. 1990) (quoting United States v. O'Connell, 841 F.2d 1408, 1427 (8th Cir. 1988)). In assessing the prejudicial impact of prosecutorial misconduct

we consider: 1) the cumulative effect of the misconduct; 2) the strength of the properly admitted evidence; and 3) the curative actions taken by the district court. See id. at 1216. When engaging in this analysis, we are mindful that the district court "is in a far better position to measure the effect of an improper question on the jury than an appellate court which reviews only the cold record." United States v. Nelson, 984 F.2d 894, 897 (8th Cir. 1993). Accordingly, we review the denial of a motion for mistrial for an abuse of discretion. See Puckett, 147 F.3d at 770.

The first instance of alleged misconduct occurred when the prosecutor revealed that one of Wadlington's co-defendants had been convicted in the conspiracy. Specifically, on redirect the prosecutor asked case agent Michael Dasso ("Agent Dasso") the following leading question: "[Samuel Miller has] been convicted in this case, hasn't he?" (Trial Tr. at 62.) Defense counsel immediately objected and later moved for a mistrial. The District Court sustained the objection and denied the motion. No immediate curative instruction was requested or given. However, at the close of all evidence, the court specifically cautioned the jurors not to consider "[s]tatements, arguments, questions and comments by the lawyers [or] [o]bjections and rulings on objections." (Clerk's Rec. at 39.) The court further instructed that "[t]he fact that a witness has pleaded guilty or been found by a jury to be guilty of a crime that arose out of the events related to circumstances charged in the Indictment in this case must not be considered by you as any evidence of the defendant's guilt." (Id. at 34.) Although the latter instruction refers specifically to the testimony of co-defendant witnesses, its dictate applies with equal force to the present facts. Simply put, "[o]ne person's guilty plea or conviction may not be used as substantive evidence of the guilt of another." United States v. Wiesle, 542 F.2d 61, 62 (8th Cir. 1976).

We have no difficulty finding that the prosecutor's question–particularly its phrasing–was improper. He not only sought inadmissible information, he actually conveyed that information to the jury through the form of the question. The

Government asserts that the question was an "invited reply" to defense allegations that the prosecution was a fraud.[7] We recognize that the Government may use evidence on

---

[7] During opening arguments, defense counsel repeatedly characterized the Government's case as a fraud. (See Partial Tr. Opening Statement of Mr. Goodman at 4-19.) Additionally, during cross-examination of Agent Dasso, defense counsel suggested that Mr. Miller's case was unrelated to the Government's case against Wadlington:

> Q: Now, I believe your testimony was that Samuel Miller and Lee Driver were . . . charged in connection with this case; is that your testimony?
>
> A: Yes, sir.
>
> ***
>
> Q: Do you know, Agent Dasso, what year those undercover buys were made from Samuel?
>
> ***
>
> A: Mr. Miller I think was 1998. I think they were both in 1998.
>
> ***
>
> Q: And you don't have any information, any surveillance of Euka Wadlington being in the town of Clinton, Iowa, in 1998, do you?
>
> A: Not in 1998.
>
> Q: But it's still your testimony that they were arrested in connection with his case; is that your testimony?
>
> A: Yes.

(Trial Tr. at 49-51.)

"redirect examination to clarify an issue that was opened up by the defense on cross-examination–even when this evidence would otherwise be inadmissible." United States v. Braidlow, 806 F.2d 781, 783 (8th Cir. 1986). It is evident, however, that the prosecutor's question went beyond simply responding to Wadlington's theory of the case, and in particular, his cross-examination of Agent Dasso. After all, the conviction of one co-defendant does not necessarily bear on the merits of the Government's case against another. In addition, the fact of Miller's conviction does not clarify whether he and Wadlington were part of the same conspiracy. We think it more likely that the question was asked for the improper purpose of suggesting Wadlington's guilt.

Notwithstanding the impropriety of the question, Wadlington has not shown, as he must, that he was prejudiced by its utterance. See Figueroa, 900 F.2d at 1216. The District Court properly sustained defense counsel's prompt objection before it could be answered by Agent Dasso. In addition, the District Court's final instructions to the jury were sufficient to quell any prejudicial effect the question might have had. See Richardson v. Marsh, 481 U.S. 200, 206-07 (1987) (remarking that there is an "almost invariable assumption of the law that jurors follow their instructions"). If Wadlington believes that a contemporaneous limiting instruction was also necessary to preserve the integrity of the trial, he should have requested one. Furthermore, the jury heard incriminating testimony for six days, the trial itself running over a two week period. We think it unlikely that this relatively fleeting impropriety so tainted the jurors' minds that they disregarded all exculpatory evidence in its favor. A mistrial would therefore have been an excessive and rather incongruous remedy under the circumstances. See United States v. Gundersen, 195 F.3d 1035, 1037-38 (8th Cir. 1999) ("The remedy of a mistrial is a drastic one, and certainly not the only way an error could have been cured."). Instead, the District Court handled the matter appropriately by giving cautionary instructions at the close of evidence.

Next, Wadlington argues that the District Court erred in denying his motion for a mistrial following Officer William Greenwalt's unexpected testimony that upon being arrested, Wadlington remarked that he had "already done his time." (Trial Tr. at 987.) Once again, defense counsel immediately objected. The District Court sustained the objection and instructed the jury to disregard the statement. The following day, Wadlington moved for a mistrial. After reviewing the previous day's transcript, the District Court denied the motion, specifically finding that the cautionary instruction was sufficient to allay any risk of undue prejudice. We agree. See Richardson, 481 U.S. 206-07.

As an aside, Wadlington also contends that the prosecutor violated discovery requirements by failing to provide him with the statement prior to trial. However, he has failed to show that the prosecutor was actually aware of the statement before it was revealed on the stand and that the prosecutor intended to use the statement during trial. See Fed. R. Crim. P. 16(a)(1)(A).

Lastly, Wadlington claims that the prosecutor's false statements of law and personal attacks on defense counsel during rebuttal summation necessitate reversal of his conviction. Because Wadlington did not object to these statements when made, we will reverse only upon a finding of plain error. See United States v. Tulk, 171 F.3d 596, 599 (8th Cir. 1999). Wadlington must therefore show that the error was clear or obvious and that it "'affected his substantial rights, which requires a showing that the error was prejudicial and affected the trial's outcome.'" Id. (quoting United States v. Johnson, 12 F.3d 827, 835 (8th Cir. 1994)). The plain error rule is designed to correct only "those errors that 'seriously affect the fairness, integrity or public reputation of judicial proceedings.'" United States v. Young, 470 U.S. 1, 15 (1985) (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936)). We reverse only if certain that "a miscarriage of justice would otherwise result." Id.

Wadlington first argues that the prosecutor misstated the law when he told the jurors that, "You know that if you believe the testimony of one witness, Azure Foster, Tina Bostic, Raashaan Wilkins, Titus Crawford, Sherman Bell, Mark Thomas, Tyrone Redmond, Kristie Barker, just one, if you believe their testimony, then you know you must find Mr. Wadlington guilty of conspiracy." (Partial Tr. Closing Argument at 27.) Because each named witness provided some link between Wadlington and the conspiracy, we are not convinced that the statement was incorrect. Nevertheless, we are unable to find the requisite prejudice because the District Court properly instructed the jury on that point of law and advised that the attorneys' statements, arguments, and comments are not evidence. See Lingar v. Bowersox, 176 F.3d 453, 460-61 (8th Cir. 1999).

Wadlington also points to the prosecutor's accusations that defense counsel misstated the evidence and engaged in unethical conduct. The prosecutor began,

> I have in my hand the Iowa Code of Professional Responsibility for lawyers, and in this book . . . there's a thing called a disciplinary rule. That's a rule that lawyers are supposed to be bound by, and the rule says . . . 'A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' I'll read that again. 'A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation.'

(Partial Tr. Closing Argument at 78-79.) He then proceeded to accuse defense counsel of violating the code in his closing remarks when he mentioned that government agents encouraged Wadlington to cooperate:

> Where is this evidence that Mr. Greenwalt and Mr. Cundiff asked Mr. Wadlington to cooperate when he was arrested? Think back on the testimony. Did anybody mention that when Mr. Wadlington was arrested, they read him his rights and asked him to cooperate?

There was no evidence of that, and yet this man can stand here and tell you that that's what happened.

Ladies and gentlemen, 'A lawyer shall not engage in conduct involving dishonesty, fraud, deceit or misrepresentation,' even misrepresentation.

(Id. at 80.) In fact, Agent Greenwalt did testify as represented by defense counsel:

Inspector Cundiff mirandized Mr. Wadlington and then asked Mr. Wadlington if he was interested in helping himself out or talking with Inspector Cundiff or myself, Inspector Cundiff informed Mr. Wadlington that at this time no promises could be made if Mr. Wadlington agreed to cooperate.

(Trial Tr. at 987.) To the extent that the prosecutor's comments can be construed as personal attacks on defense counsel, they were certainly improper. The Government does not deny that. However, viewed in the light of both parties' summations and the trial as a whole, we do not believe that plain error flowed from the comments. This is primarily because they were discernible attempts to address defense counsel's relentless–and at times questionable[8]–attacks on his case. Certainly, two wrongs do

---

[8] For example, defense counsel accused the Government of suborning perjury and coercing its witnesses to lie:

Drugs are bad, there's no question about it; but the behavior of the government in this case is worse. Do you want to live in a country where the government has this kind of power to indict people, to make them say what they want them to say, to destroy a citizen of this country because he won't talk and cooperate and tell lies about other people, where human beings are treated like pawns in some game, where someone lies on you so you have to lie on somebody else? And what is the purpose of all of this? Is it because–are they

-17-

not make a right, however, the comments "did no more than respond substantially in order to 'right the scale.'" Young, 470 U.S. at 12-13. Moreover, the comments were not so inflammatory as to jeopardize Wadlington's due process rights. See James v. Bowersox, 187 F.3d 866, 868-70 (8th Cir. 1999).

Because the cumulative effect of prosecutorial misconduct must be assessed in determining whether the defendant was prejudiced, a finding that each particular instance of misconduct was harmless does not end the inquiry. See Figueroa, 900 F.2d at 1216. Reviewing the record as a whole, we cannot conclude that even the cumulative effect of prosecutorial misconduct denied Wadlington a fair trial. Each instance of impropriety occurred at different times over the course of the six day trial, during which the Government presented ample evidence of Wadlington's guilt. Additionally, presumably effective curative instructions were given by the District Court where appropriate. Because we find no miscarriage of justice, we affirm the District Court's denial of a mistrial. Of course, by our decision we do not condone prosecutorial misconduct, either purposeful or incidental. We once again caution that

> [t]he United States Attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a

---

> solving the drug problem by turning all of these people against each other, making them tell stories about each other? Are they getting this dangerous drug dealer off the street? Is it because he's so bad and so dangerous that they have to resort to these types of tactics to get him? You know that's not true.

(Partial Tr. Closing Arguments at 77.)

peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor–indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88 (1935).

## B.     Denial of Motion to Continue Trial.

Wadlington next argues that the District Court erred in denying his motion to continue the trial following the return of the second superseding indictment. He insists that a 30 day continuance was necessary to adjust to the new evidence against him, namely, the inculpatory testimonies of Ellis and Kelly. A district court's denial of a motion for continuance is reviewed for an abuse of discretion and will be reversed only if the movant was prejudiced thereby. See United States v. Velasquez, 141 F.3d 1280, 1282 (8th Cir. 1998). As a general rule, motions to continue following the return of a superseding indictment are granted if the defendant is "prejudiced by a lack of time to prepare to meet the new charges." United States v. Vaughn, 111 F.3d 610, 613 (8th Cir. 1997).

In this case, Wadlington was not substantively affected by the new indictment. No additional charges were brought against him, and he did not have to sort through new allegations or plan for a new defense. Furthermore, the indirect effects of the new indictment, i.e., the damaging testimonies of Ellis and Kelly, could not have been cured with additional time. Having found no prejudice, we cannot conclude that the District Court erred in denying Wadlington's request for a continuance.

## C.     Drug Amount Admitted at Trial.

The District Court's decision to admit evidence is reviewed under the abuse of discretion standard.  See United States v. Davis, 154 F.3d 772, 778 (8ᵗʰ Cir 1998). Wadlington argues that the District Court erred in admitting "a mountain of crack cocaine" which was not properly connected to him.  During trial, defense counsel raised numerous objections to the inclusion of such evidence, all of which were overruled.  We have reviewed the record and conclude that the District Court did not abuse its discretion in admitting the drug evidence.

### D.    Sentencing.

Wadlington has raised numerous objections to his sentence.  We will consider only those contentions which include "citations to the authorities and parts of the record on which [he] relies."  Fed. R. App. P. 28(a)(9); see also United States v. Gonzales, 90 F.3d 1363, 1370 (8ᵗʰ Cir. 1996).

Wadlington first contends that the District Court's consideration of two prior drug felonies constituted impermissible "double counting" because they occurred during the course of the charged conspiracy in this case.  We disagree.  As the Government correctly notes, the two convictions were "prior sentences" under U.S.S.G. § 4A1.2(a)(1) because they occurred outside of the scope of the second superseding indictment.  The first prior drug conviction occurred in 1988, at least two years before the instant conspiracy began. The second drug conviction, although within the time frame of the indictment, occurred outside of its geographical scope. Specifically, Wadlington was convicted of possession with intent to deliver cocaine in Illinois. The conspiracy charge in the second superseding indictment is geographically limited to the Southern District of Iowa.

Wadlington also argues that the District Court erred in calculating the drug amount for sentencing purposes. At sentencing, the Government must prove the drug amount by a preponderance of the evidence. See United States v. Guerra, 113 F.3d 809, 819 (8th Cir. 1997). On appeal, the defendant has the burden of proving that the District Court's determination as to drug amount was clearly erroneous. See id.

At sentencing, the District Court adopted the drug amount calculation contained in the Presentence Investigation Report after determining that the Government's witnesses at trial and at sentencing were credible. There is no question that "a sentencing judge who presides over a trial is entitled to base his findings of fact on the trial record." United States v. Padilla-Pena, 129 F.3d 457, 468 (8th Cir. 1997). In addition, a district court's credibility determination is virtually unreviewable on appeal. See United States v. Womack, 191 F.3d 879, 885 (8th Cir. 1999). Because we are not "firmly convinced" that the District Court erred in making these determinations, we affirm. Guerra, 113 F.3d at 819.

## III.    CONCLUSION

For the foregoing reasons, the judgment and sentence of the District Court are affirmed.

HEANEY, Circuit Judge, dissenting.

I respectfully dissent. After reading the transcript of the relevant grand jury proceedings, I am convinced that the primary purpose for calling Juanita Ellis and Lawanda Kelly before the grand jury was to secure their testimony against Euka Wadlington. The government concedes that if this were its purpose, it would be improper.

Kelly testified that after she received the grand jury subpoena, the court appointed a lawyer to represent her. After meeting with him, Kelly's understanding was that prosecutors merely wanted her to tell the truth about what she knew about Wadlington. When called before the grand jury, one of the first questions asked of Kelly was, "Are you prepared then to answer questions truthfully about your knowledge of Euka Wadlington and his illegal activities?" Her answer was "[y]es." She was then asked, "And the activities of the people he worked with?" She responded, "Yes." (Appellee's App. at 18.) The initial question hardly squares with the statement of the United States Attorney at oral argument that it was no part of the government's intention at all to call Kelly or Ellis to give evidence that could be used against Wadlington.

Kelly also testified that she had a romantic relationship with Wadlington that lasted for about a year and a half, and that she saw him turning powder cocaine into crack cocaine on a number of occasions. Further, she testified that there came a time in her relationship with Wadlington when she realized that he was not running a club in Clinton, Iowa, but that he was selling drugs, and that the people who came to her house with him looked like addicts.

During the course of her grand jury testimony, Kelly was asked about several other persons, including Phyllis and Terrance McLoyd, Dee Isaac, Tina Bostic, Azure Foster, Sherman Bell, Big Ed, Otis Carter (an addict to whom Wadlington would give drugs), Melvin Yancy, Mack Douglas, Jack Jetter, Jennifer Bopes, Jessie Sparlin, Heather Kline (with whom Wadlington fathered a child), and Amos Ellis. Members of the grand jury then asked Kelly about Flame, Gregory Smith, Andrea, Pamela, Lashawn Coleman, Jessie, Bill Dowery, June Bug, Wimp, and Durrell.

After reading the transcript, I am left with the firm impression that the primary purpose of calling Kelly before the grand jury was to strengthen the case against

Wadlington. There certainly was nothing in Kelly's testimony that would support adding either Samuel Miller, Terrance Hood or Lee Paige Driver to the conspiracy count. Certainly an argument can be made that Kelly's testimony before the grand jury provided information that permitted the addition of Terrance McLoyd to the list of conspirators. In my view, however, this was an incidental benefit of her testimony rather than the primary reason for it.

Juanita Ellis was also called before the grand jury and was granted immunity from the government in exchange for her testimony. She was told that the grand jury was investigating Wadlington and his associates. Ellis had been interviewed a short time earlier about her knowledge of Wadlington. She testified that she had seen crack sold in Wadlington's presence, and that she believed Wadlington was the source of the drugs. Ellis also testified that Wadlington's closest associates in Clinton were Samuel, Edward (Big Ed), Red, and Terrance McLoyd. Ellis admitted that she had, for a time, sold crack cocaine supplied by Big Ed and Red.

Ellis further testified that she knew Terrance McLoyd, that she was not sure if he dealt drugs or not, but because he was associated with everyone else who was dealing, she would have to say he was dealing drugs. She was then asked, "[I]s it fair to say that because of the process of negotiating with you about your concerns for safety for your family and your own protection for immunity, that we really haven't had enough time today to find out everything you know about Mr. Wadlington?" Her answer was, "True." (Id. at 9.)

Again, after reading Ellis's testimony, I am left with the firm impression that the primary purpose in calling her before the grand jury was to bolster the case against Wadlington.

-23-

There remains the question of whether Wadlington was prejudiced by this misuse of the grand jury process. I believe that this issue should first be determined by the district court. I would therefore remand the matter with directions to determine whether there was sufficient evidence to sustain Wadlington's conviction without the information gained from the grand jury testimony of Kelly and Ellis.

A true copy.

Attest.

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.