# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-1886

_____

United States of America,

          Appellee,

v.

Robert Frederick Johnston, Jr.,

          Appellant.

\*    
\*    
\*    
\*   Appeal from the United States
\*   District Court for the
\*   Southern District of Iowa.
\*    
•       [PUBLISHED]
\*    
\*    

_____

Submitted: October 22, 2003

Filed: December 24, 2003

_____

Before LOKEN, Chief Judge, and HEANEY and MORRIS SHEPPARD ARNOLD, Circuit Judges.

_____

PER CURIAM.


      Robert Frederick Johnston, Jr., was convicted of one count of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A), and § 846. Johnston contends the district court[1] committed reversible errors during

_____

[1]The Honorable Robert W. Pratt, United States District Court for the Southern District of Iowa.

trial and improperly applied the United States Sentencing Guidelines in sentencing him to 210 months in prison. First, Johnston argues that the district court should have granted a mistrial after the government introduced evidence of his involvement with methamphetamine outside of the dates in the indictment. Second, Johnston claims that the district court should not have admitted evidence of controlled buys that did not involve him. Finally, Johnston maintains the district court's sentencing was flawed for three reasons: 1) the district court erroneously determined the drug quantity attributable to him; 2) the district court should have granted a downward adjustment for his mitigating role; and 3) the district court should have granted a downward adjustment for his acceptance of responsibility. Finding no reversible trial or sentencing errors, we affirm the district court.

## **Background**

In addition to Johnston, the drug conspiracy involved Lori Arnold, Robert Paris, Charles William Chilton, Marco Armenta, William Wilt. Johnston was independently charged for his role in the conspiracy. Arnold, Armenta, and Wilt all pled guilty to charges stemming from their participation in the conspiracy, and were sentenced to 131 months, 84 months, and 72 months respectively. The conspiracy operated in the following manner: Arnold, Paris, and Chilton bought large quantities of methamphetamine from Armenta, who obtained the methamphetamine from suppliers elsewhere. Arnold shared some of the methamphetamine with her then-boyfriend,[2] Wilt, and sold the rest. Johnston sold small quantities of methamphetamine that he obtained from Arnold or Paris to Charles Arden Jackson, a user, and Armenta, and also acted as Paris and Arnold's courier, shuttling drugs and money for larger deals.

---

[2]Arnold and Wilt are now married.

Jackson, Arnold, Armenta, and Wilt, all testified against Johnston at trial. Armenta testified that he bought a total of an eighth of an ounce of methamphetamine from Johnston, and that Johnston was present during a negotiation between Chilton and Armenta's suppliers. Arnold testified that she sold Johnston two ounces of methamphetamine, and sold one ounce to Jackson on Johnston's behalf. Wilt testified that he sold Johnston a total of one-quarter ounce, that he witnessed Johnston buy small quantities[3] from Arnold and Paris, and that he gave Johnston two ounces that Johnston then delivered to Paris as satisfaction for a debt Wilt owed to Paris. Jackson testified he bought a half ounce of methamphetamine from Johnston during the summer of 2001.

Johnston played a role in two drug deals involving larger quantities of drugs. One drug deal occurred in June 2001, and the other in July 2001. Arnold testified that in June, she used Johnston to deliver $4,200 to Chilton. Paris, Chilton, and Arnold were pooling their money to buy five pounds of methamphetamine from Armenta's suppliers. The deal went awry, and Arnold gave Johnston an additional $4,200 to deliver to Chilton in order to appease the suppliers.[4] In late July of 2001, Wilt and Arnold both testified that Johnston again acted as a money courier. Paris was out of town for this deal, and left Johnston in charge of delivering money to Chilton. Arnold testified that Johnston handled $20,000[5] for this deal; Wilt recalls counting out $15,000 of Arnold's money for this deal, but was only aware of Johnston's involvement through phone calls he overheard between Paris and

---

[3]While not exact, Wilt estimated these smaller quantities ranged from one-sixteenth of an ounce to a quarter ounce.

[4]Armenta's recollection of this event differed from Arnold's recollection. Armenta remembered picking up an additional $2,500 from Johnston in order to pacify the suppliers, and maintains the transaction was for two pounds of methamphetamine, not five pounds as Arnold testified.

[5]Arnold contributed $15,000, with Chilton contributing $5,000.

Johnston. The July deal was supposed to be for ten pounds of methamphetamine, but according to Arnold, only five pounds changed hands. Johnston delivered to Arnold her two-and-a-half pound portion.

The police learned of the drug conspiracy when Jackson began cooperating with the police after he violated the terms of his probation. Jason Fuller, at the time a Special Agent with the Iowa police department, staged several buys from Arnold with Jackson's cooperation. Agent Fuller testified that Johnston was present for one of these buys involving 111.79 grams of methamphetamine,[6] although there is no indication that he actively participated in the sale.[7] Johnston was never found with marked money from any of the controlled buys.

On May 10, 2002, Johnston was arrested. At that time, he admitted he was a methamphetamine user, had received methamphetamine from Arnold, and had sold a portion of his one-eighth ounce quantities to support his habit. Johnston told police that he was around Paris and large quantities of drugs, and he identified Paris's buyers. He also admitted that when Paris was out of town, he had $20,000 that he was supposed to deliver for a drug buy; he claimed he did not deliver the money though, and that Arnold picked it up. Johnston remembered being present for a deal with the undercover agent as well.

Johnston was indicted for conspiring to distribute 500 grams or more of methamphetamine. The jury found him guilty of conspiring to distribute less than fifty grams of methamphetamine. At sentencing, the district court attributed 2,560.51

---

[6]Only half of the methamphetamine in this sale was purity tested: 55.84 grams were 27% pure, while the remaining 55.95 grams were not purity tested.

[7]In fact, during Arnold's cross examination, she admitted Johnston entered the room during this controlled buy, probably to ask her a question about electrical work he was completing in her bar.

-4-

grams of methamphetamine to Johnston and determined his base level offense was 34, with a criminal history category of IV. The district court sentenced him to 210 months in prison.

## Discussion

## I. Mistrial

Johnston first argues that the district court erred by not declaring a mistrial after Jackson's testimony. We review a district court's refusal to grant a mistrial using an abuse of discretion standard. United States v. Washington, 318 F.3d 845, 859 (8th Cir. 2003).

Jackson testified during the prosecution's direct examination as follows:

Q: How long have you known Reid Paris?
A: Since about 2001.
Q: How long have you known Howdy?[8]
A: Since about '95.
Q: Have you ever known Howdy to be involved in methamphetamine?
A: Yes.
Q: And when did you first become aware of that?
A: Probably '95.
Q: Did there come a time that you obtained methamphetamine from Howdy?
A: Yes.
Q: When did you obtain methamphetamine from Howdy?
A: In 2001.

---

[8]Johnston is also known as "Howdy."

Q: About when did that occur first?

A: Probably the summer.

(Partial Trial Tr. Test. of Charles Jackson at 8.)

The indictment alleged Johnston was involved in a methamphetamine conspiracy from April 1, 2001, through October 26, 2001. Johnston maintains that Jackson's reference to his involvement with methamphetamine since 1995 was grounds for a mistrial for three reasons: 1) Jackson's testimony should have been barred by Federal Rule of Evidence 404(b) as propensity evidence; 2) Jackson's testimony served as an impermissible amendment or as a material variance to the indictment; and 3) it was prosecutorial misconduct for the prosecution to inquire about his 1995 involvement with methamphetamine.

A.  Propensity Evidence

In response to Jackson's testimony, the district court delivered the following cautionary instruction to the jury:

> Evidence has been introduced by a Government witness that purports to suggest that Mr. Johnston was involved in drug activity not covered during the period of this indictment. The evidence should not have been injected into this trial. You are to disregard the testimony. You cannot use that testimony in your deliberations in any manner. The Court, by this ruling, strikes the testimony and prohibits the prosecution from any further reference to that testimony in this proceeding.

(Trial Tr. Vol. III at 368.)

The court, unless there is evidence to the contrary, should assume that a jury will follow a curative instruction. United States v. Uphoff, 232 F.3d 624, 626 (8th

-6-

Cir. 2000). The jury was instructed not to consider Jackson's reference to Johnston's 1995 involvement with methamphetamine. In fact, the district court's instruction struck the portion of Jackson's testimony that Johnston maintains was prohibited by Federal Rule of Evidence 404(b). We are satisfied that this admonishment adequately protected Johnston from having Jackson's testimony improperly used against him.

### B. Constructive Amendment or Material Variance to the Indictment

Johnston next argues that Jackson's testimony served as a constructive amendment or as a variance to the indictment by introducing evidence outside of the dates of the indictment. A constructive amendment, which is reversible error per se, occurs when the essential elements of the indicted offense are altered, either actually or in effect, after the grand jury has issued the indictment. United States v. Novak, 217 F.3d 566, 574 (8th Cir. 2000). In order to determine whether the indictment was constructively amended, the court must consider "whether the admission of certain evidence created a 'substantial likelihood' that [the defendant] was convicted of an uncharged offense." Id. at 575. The Eighth Circuit has described a variance, on the other hand, as "chang[ing] the evidence, while the charge remains the same." United States v. Stuckey, 220 F.3d 976, 981 (8th Cir. 2000). A variance is grounds for a reversal only if the defendant has been prejudiced by the change in evidence. Novak, 217 F.3d at 574.

As stated above, the jury was instructed to ignore Jackson's testimony as it related to periods of time outside of the indictment. Our review of the record reveals that the prosecution did not explore the 1995 time frame with Jackson. The focus of the prosecution's direct and redirect examination was on Jackson's knowledge of Johnston's conduct as it related to the conspiracy in 2001. Because of this, Jackson's reference to 1995 did not create a substantial likelihood that Johnston was convicted

of drug trafficking in 1995.[9]  We therefore find that Jackson's testimony did not amend the indictment, or function as a variance to the indictment.

### C.  Prosecutorial Misconduct

Johnston maintains that the prosecutor acted improperly by asking Jackson when he first knew of Johnston's involvement with methamphetamine.  To find prosecutorial misconduct, the court must examine whether the prosecutor made improper remarks and whether those remarks "prejudicially affected the defendant['s] substantial rights so as to deprive [him] of a fair trial."  United States v. Wadlington, 233 F.3d 1067, 1077 (8th Cir. 2000).  Three factors are used to assess the prejudicial impact on a defendant: "1) the cumulative effect of the misconduct; 2) the strength of the properly admitted evidence; and 3) the curative actions taken by the district court."  Id.

There is no indication that the prosecutor was aware of Johnston's involvement with methamphetamine in 1995 prior to examining Jackson.  The government asked an open-ended question; the question itself was not improper.  Again, the district court's curative instruction corrected any prejudice Jackson's comment may have caused Johnston.  We do not find that the prosecutor's actions rose to the level of misconduct required to declare a mistrial.

## II.    Admissibility of Evidence of Controlled Buys that Did Not Involve the Defendant

Johnston argues that the district court abused its discretion by admitting evidence of controlled buys that did not involve him.  We review a district court's

_____

[9] Further, since the facts around the 1995 comment were not developed, the jury could not have used this evidence in reaching its decision about the conspiracy in 2001.

decision to admit such evidence using an abuse of discretion standard; if the district court's error in admitting the evidence was harmless, we will not reverse the district court. United States v. Oleson, 310 F.3d 1085, 1091 (8th Cir. 2002).

In a conspiracy case, "each member of a conspiracy may be held criminally liable for any substantive crime committed by a co-conspirator in the course and furtherance of the conspiracy, even though those members did not participate in or agree to the specific criminal act." United States v. Escobar, 50 F.3d 1414, 1420 (8th Cir. 1995) (quoting United States v. Lucas, 932 F.2d 1210, 1220 (8th Cir. 1991)). We agree with the district court that the controlled drug buys were relevant in this case because they illustrated the extent of the conspiracy's operation. Even though Johnston may not have been directly involved in the buys (although he was at least present during one such buy), he can still be held responsible for the reasonably foreseeable buys that occurred on behalf of the conspiracy. Id. Here, the complained-of evidence involved sales by co-conspirators to an undercover agent. The district court, therefore, did not abuse its discretion by admitting testimony relating to these buys.

## III.  The Drug Quantity Used at Sentencing

The district court sentenced Johnston for conspiring to distribute 2,560.51 grams of methamphetamine, even though the jury found him guilty of conspiring to distribute less than fifty grams of methamphetamine.  Johnston maintains that the evidence does not support the district court's drug quantity determination.

We review the district court's application of the Sentencing Guidelines de novo. United States v. Barrios-Perez, 317 F.3d 777, 780 (8th Cir. 2003).  The district court's factual findings in relation to drug quantity are reviewed for clear error. Id. "The District Court must determine the amount of drugs for which a criminal

defendant is responsible by a preponderance of the evidence." United States v. Gallardo-Marquez, 253 F.3d 1121, 1124 (8th Cir. 2001).

Johnston states he only played a minor part in the conspiracy, if he played any part at all, and that the government did not prove by a preponderance of the evidence that he could have reasonably foreseen the full extent of the conspiracy. Johnston also directs us to the jury verdict finding him responsible for conspiring to distribute fifty grams or less of methamphetamine, although he concedes that for sentencing purposes the evidence supports his involvement with 139 grams of methamphetamine; this would bring his base level offense down to 26. The government responds that 1) the jury verdict could have been influenced by factors independent of Johnston's actual involvement in the conspiracy, and 2) the district court based its quantity determination on sufficiently reliable evidence.

The district court can impose a sentence based on a higher drug quantity determination than the jury's finding so long as the sentence does not exceed the statutory maximum of the convicted offense. See United States v. Titlbach, 300 F.3d 919, 921-22 (8th Cir. 2002) (affirming the district court's drug quantity determination of 172.03 grams of methamphetamine, even though the jury found the defendant guilty of a conspiracy involving fifty grams or less); United States v. Caldwell, 255 F.3d 532, 533 (8th Cir. 2001) (per curiam) ("The use of a judicially determined drug quantity as a basis for sentencing is permissible . . . so long as the defendant's sentence does not exceed the statutory maximum sentence available for an indeterminate amount of the drug." (citing United States v. Aguayo-Delgado, 220 F.3d 926, 933-34 (8th Cir. 2000), cert. denied, 531 U.S. 1026)). Here, the district court's sentencing of Johnston does not run afoul of this rule.[10]

---

[10]The statutory maximum for conspiracy to distribute fifty grams of methamphetamine is twenty years, 21 U.S.C. § 841(b)(1)(C), longer than Johnston's 210 month sentence.

In reaching its quantity determination, the district court had to make credibility determinations. Our review of the record reveals weaknesses in some of the witnesses' testimony and some conflicting testimony.[11] The district court, however, has considerable discretion in determining the credibility of witnesses, and we do not find the district court abused its discretion in assessing the trial testimony. See United States v. Carter, 997 F.2d 459, 461 (8th Cir. 1993).

Arnold, Armenta, Wilt, and Jackson all testified as to Johnston's involvement with the conspiracy. Armenta and Arnold both testified that Johnston handled money for a June deal involving two pounds of methamphetamine.[12] Arnold and Wilt testified that in July, Johnston acted as a courier to complete a drug deal for five pounds of methamphetamine while Paris was out of town. We find that the testimony describing Johnston's involvement with the deals in June and July of 2001, connects him to 2,268 grams of methamphetamine by a preponderance of the evidence. This amount alone is sufficient to justify Johnston's base offense level of 34. Additionally, Arnold admits to selling Johnston an ounce on two occasions, and selling another ounce to Jackson on Johnston's behalf (85.05 grams); Armenta and Jackson testified to buying methamphetamine from Johnston in an amount totaling 17.72 grams; Wilt admits to selling Johnston 7.08 grams and fronting Johnston 56.7 grams on Paris's behalf; and Agent Fuller places Johnston at a controlled buy involving 111.79 grams of methamphetamine. Accordingly, our review of the

---

[11]For instance, Arnold, during her cross examination admitted she had lied during her direct examination in regards to Wilt's involvement with the conspiracy. Certainly this admission could be used to discredit the entirety of Arnold's testimony. Additionally, while Arnold and Armenta both testified as to Johnston's participation in the June 2001 deal, each testified to a different amount of methamphetamine involved in the deal.

[12]Armenta testified that the June 2001 deal involved two pounds, or 907.20 grams, of methamphetamine, while Arnold testified the deal involved five pounds. We are using the lower amount to calculate the drug quantity.

-11-

evidence indicates a preponderance of the evidence connects Johnston to 2,546.34 grams of methamphetamine. While this amount is slightly lower than the district court's determination, either amount results in the same base offense level. Therefore, we find the district court was within its discretion to sentence Johnston using a base offense level of 34.

## IV. Mitigating Role Adjustment

Johnston maintains the district court should have granted him a mitigating role adjustment, of either two or three levels, pursuant to United States Sentencing Guideline § 3B1.2. The district court's decision regarding a role reduction is a fact determination, which we review for clear error. United States v. Thurmon, 278 F.3d 790, 792 (8th Cir. 2002). "A defendant's role in the offense is measured by the relevant conduct for which he is held responsible." Id. Once the district court has determined the relevant conduct, each participant's actions should be compared against the other participants, and each participant's culpability should be evaluated in relation to the elements of the offense. Id.

Johnston argues that he did not negotiate any deals or put any of his own money into the conspiracy for the purpose of buying mass quantities of drugs. He claims he was just a user and a gopher who did not even have a cellular telephone. Johnston was never found with any marked money, and was not an active participant in any of the controlled buys. In response, the government stresses Johnston's role as manager of the drug operation when Paris was absent.

The district court, by using the 2,560.51 grams of methamphetamine as the basis for sentencing Johnston , defined the relevant conduct as the wider conspiracy. The district court stated that "the defendant knew a great deal about the drug operation . . . and that he helped collect money and make distributions." (Sentencing Tr. at 15.) Arnold, a person who knew more about the conspiracy than Johnston , was

only sentenced to 84 months, while Johnston was sentenced to 210 months. This is troubling. Ultimately, however, we do not think the district court's conclusion about Johnston's role in the conspiracy was clearly erroneous. Johnston acted as the go-between on several different drug buys, either delivering the drugs, or delivering the money. When Paris was out of town, he used Johnston as a courier to complete a sale. This supports the district court's observation that Johnston knew, and participated in, the full extent of the conspiracy. Accordingly, the district court did not abuse its discretion in refusing to grant Johnston a downward departure for a minor participant role, particularly in light of his criminal history.

## V. Acceptance of Responsibility Adjustment

Johnston finally argues the district court should reduced his sentence because he accepted responsibility for his actions. A court may reduce a defendant's offense level by two levels where the defendant clearly demonstrates acceptance of responsibility. USSG § 3E1.1. The comment makes clear, however, that this reduction does not often apply to defendants who go to trial:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt . . . . In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

USSG § 3E1.1 comment 2.

Johnston maintains that he only went to trial because he disputed the amount of the methamphetamine the government attributed to him. He points to his statement to police as proof that he admitted his conduct prior to the trial. Just because Johnston cooperated, however, does not mean he is entitled to the acceptance of responsibility adjustment. By disputing the amount of methamphetamine he was responsible for, he put the government to its proof and challenged his factual guilt. The district court was within its discretion to deny Johnston an adjustment for acceptance of responsibility.

## Conclusion

The district court acted within its discretion in refusing to declare a mistrial and in sentencing Johnston to 210 months in prison. Accordingly, we affirm.

HEANEY, Circuit Judge, concurring.

I am troubled by the fact that the district court used a drug quantity at sentencing fifty times larger than the jury's verdict. Notwithstanding considerable evidence as to the substantial quantity of methamphetamine involved in this conspiracy, the jury specifically found that Johnston was responsible for distributing less than fifty grams. Under these circumstances, it is my feeling that the district court should not be permitted to ignore the jury's conclusion. The district court, because of its ability to base its drug determination on a preponderance of the evidence, has considerable discretion in sentencing, and the power to impose a harsher sentence than a jury would on the same facts. By allowing the district court to base drug quantity determinations using this lower level of proof, I believe the stated goal of the Sentencing Guidelines – to promote uniformity in sentencing – is undermined.

_____